**Ethel BROWN, Plaintiff,**

v.

**ROLLINS, INC., a corporation, and Dwoskin, Inc., a corporation and wholly owned subsidiary of Rollins, Inc., Defendants.**

**No. C–C–73–43.**

United States District Court,
W. D. North Carolina,
Charlotte Division.

Dec. 20, 1974.

Robert Belton, James E. Ferguson, II, Chambers, Stein & Ferguson, Charlotte, N. C., for plaintiff.

James M. Walters, Fisher & Phillips, Atlanta, Ga., for defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

McMILLAN, District Judge.

### FINDINGS OF FACT

1. Plaintiff, Ethel Brown, is a black female citizen of the United States and the State of North Carolina, residing in Charlotte, Mecklenburg County, North Carolina.

2. Defendant, Dwoskin Incorporated (hereinafter "Dwoskin"), is a Georgia

corporation authorized to do business in North Carolina and is doing business in Charlotte, North Carolina. Dwoskin maintains its principal place of business in Atlanta, Georgia and is a wholly owned subsidiary of defendant, Rollins, Inc.

3. Dwoskin maintains a branch office in Charlotte, North Carolina, engaged in the distribution and sale of wall paper coverings. This branch office consists of a show room where direct sales are made to the general public, retailers, interior decorators and contractors; a general office area; and a warehouse area where merchandise is stored.

4. Defendant Rollins, Inc., is a Delaware corporation authorized to do business and is doing business in North Carolina and Mecklenburg County, North Carolina through its wholly owned subsidiary, Dwoskin. Rollins is a service corporation which owns and operates defendant Dwoskin. Rollins maintains its principal place of business in Atlanta, Georgia. Rollins is a nominal party by virtue of its ownership of Dwoskin.

5. Defendants Dwoskin and Rollins are employers within the meaning of 42 U.S.C. Section 2000e(b) and they are engaged in an industry affecting commerce within the meaning of Title VII of the Civil Rights Act of 1964.

6. Dwoskin has operated its branch office in Charlotte since November, 1963.

7. As of January 1, 1970 Dwoskin maintained the following job categories at its Charlotte branch:

| | |
|---|---|
| Branch manager | Warehouse clerk |
| Office manager | Showroom sales person |
| Credit manager | Outside salesman |
| Warehouse manager | Sample room girl 1 |
| Warehousemen (or employee) | |

8. The number of employees by race who have occupied each of the job categories maintained by Dwoskin at any time between January 1, 1970 and May 29, 1973 was as follows:

| | White | Black |
|---|---|---|
| Branch manager | 2 | — |
| Office manager | 1 | — |
| Credit manager | 1 | — |
| Office clerical | 18 | 1 |
| Outside sales | 9 | — |
| Showroom sales person | 11 | — |
| Warehouse manager | — | 1 |
| Warehouse clerk | 1 | 5 |
| Sample room girl | — | 1 |

9. All of the showroom persons employed at any time at Dwoskin since it opened its Charlotte branch in November, 1963 have been white and all of the persons employed as sample room girl since that date have been black female.[2]

10. Plaintiff was employed by Dwoskin at its Charlotte branch on May 23, 1968, as a sample room girl at the rate of $1.60 per hour. Her duties as sample room girl included keeping current all samples of wall covering; disposing of discontinued books of wall covering; removing carry-over samples of wall covering; keeping the sample room kitchen, office lounges and showroom, manager's office and fabric sample room clean; disposing of trash and keeping ashtrays clean; cleaning windows; dusting and polishing tables; maintaining copies of wallpaper book samples in the book library; emptying waste baskets and vacuuming carpets. Her normal work week was forty hours. At the time plaintiff was discharged on January 16, 1970, she was earning about $1.725 per hour.

11. In addition to the duties described in finding 10, *supra*, plaintiff also, from time to time, answered telephone inquiries and assisted in answering written inquires from customers or potential customers of Dwoskin at the request of the office personnel, showroom sales person and branch manager Vale.

---

1. After January 1, 1970 the position of sample room girl was eliminated and most of the duties theretofore performed by the sample room girl are now the responsibility of the showroom sales person.

2. There have been at least four black females, including the plaintiff, who were hired as sample room girls.

12. At other times the plaintiff assisted in showroom sales work.[3] The plaintiff did not get the commission on sales she made but the commission was credited to white sales persons.

13. Shortly after plaintiff was employed, she advised the then branch manager [Kurtzman] of her interest in the position of showroom sales. At the time there was only one showroom sales person, Mary Price, a white female.

14. The primary duty of showroom sales persons from May, 1968 through January, 1970 (period of plaintiff's employment) was selling wallpaper to retail customers who came into the store. The position did not involve the solicitation of sales.

15. Showroom sales persons receive a base salary plus 3% commission on all sales made by them or credited to their sales number. Occasionally they receive a 5% commission on special sales.

16. Dwoskin has no objective requirements or minimum qualifications a candidate must meet in order to be considered for the position in showroom sales. For example, Mary Price, the showroom manager during the period plaintiff was employed had never worked in any capacity in interior design or decorating. Price, after graduating from high school, took a one year course in Business Administration. Prior to her employment with Dwoskin she had worked as a secretary for a bank. She was hired by Dwoskin in 1964 as a general office worker. Subsequently she was promoted to office manager, then showroom sales and eventually to showroom manager. The only prior sales experience Price had before her promotion to showroom sales was that of occasionally assisting sales personnel when the showroom became crowded. Price had not affirmatively sought a sales position; the position was offered to her. All of her experience in showroom sales work was through on the job training with Dwoskin.

17. During the period of plaintiff's employment with Dwoskin, applicants for employment, including showroom sales positions, were selected solely on the basis of subjective criteria, such as "the best applicant," "most qualified applicant," the person "who best impressed [the branch manager] with knowledge of [Dwoskin's] particular field or industry" for showroom sales. In plaintiff's case, the standard used for employment was the branch manager's personal "impressions, the eagerness of the persons . . . to want to do a good job, personal problems," "try to hire people [who] will come to work every day and not be out for family reasons or babies".

18. During the period of plaintiff's employment, the several white females who were hired in showroom sales were given no training whatsoever. They were simply told what their job would be by the showroom manager. With respect to the paper work involved in a sale, the showroom manager only worked with them on maybe a half dozen orders as part of the orientation to the job.

19. Shortly after plaintiff first expressed her interest in a showroom sales position (see finding 13, *supra*), a vacancy for that position occurred and Dwoskin hired Linda Huntley, a white female, for the vacancy. Huntley had applied for the position on July 22, 1968 and was hired sometime prior to November, 1968. Huntley had no experience in sales, interior design or decoration prior to her employment with Dwoskin. After completing high school, Huntley had completed a two-year course in Business Administration at Western Carolina University. Her only prior work experience as shown on her application was as a waitress. Although Huntley had stated on her application that she had "studied interior design" and listed

---

3. The evidence with respect to this finding of fact is conflicting. The court, having weighed the testimony, finds that the plaintiff's testimony is credible both as to this question of fact and in general.

"home furnishing" as an additional skill, Dwoskin made no effort to verify these statements because at the time Huntley was employed the practice of Dwoskin was not to investigate either prior experience or educational background of an applicant.

20. Plaintiff was not given any consideration for the position for which Huntley was employed even though Kurtzman was still branch manager and even though plaintiff had spoken to Kurtzman about her interest in the position before Huntley was employed. Price, the showroom manager who hired Huntley, stated she did not give any consideration to the plaintiff for the position for which Huntley was hired because she "didn't have any idea that [plaintiff] was interested". However, Price was offered a showroom sales position even though she had not specifically requested it.

21. The defendants failed to introduce evidence to demonstrate that Huntley was more qualified than the plaintiff for showroom sales or that the plaintiff was not qualified for the position.

22. After William Vale became the branch manager in November, 1968, plaintiff discussed her interest in a showroom sales position with him on three or four different occasions. The first time was approximately one month after Vale became branch manager. At this time there were two persons in the position—Price and Huntley. Plaintiff also wrote Vale a letter which he described as "quite a good letter" telling him why she would like the opportunity to become a sales person.

23. Plaintiff had demonstrated an interest in interior decorating before she was employed at Dwoskin. She had experimented with colors and fabrics in decorating her own home. From time to time she had assisted her neighbors in decorating their homes; and she had also read magazines and other literature pertinent to this interest.

24. On June 3, 1969, Dwoskin hired Jill Kinney, a white female, as a temporary replacement for Huntley who was to go on maternity leave. Kinney's application was dated May 10, 1969.

25. Prior to her employment at Dwoskin, Kinney had received a B.S. in Education from Campbell College. Her prior work experience, as shown on her application, was as playground director, cafeteria worker, library assistant and assistant camp unit leader. She had at one time considered a major in Home Economics and had taken a two dimensional art course and a textile course. However, the defendants failed to introduce evidence to demonstrate that Kinney was more qualified for showroom sales than the plaintiff, or that plaintiff was not qualified for the position.

26. Vale testified that although plaintiff was considered for the temporary vacancy for which Kinney was hired, he decided not to give her an opportunity to demonstrate that she could qualify for the position because he "felt that he knew [plaintiff] well enough at that point that if [he] put [plaintiff] on the floor for three months and when Ms. Huntley came back put [plaintiff] back to her regular job [as sample room girl], that [he] would lose [the plaintiff]", i. e., plaintiff would quit.

27. Price, the showroom manager, was not in on the first day Kinney came to work, and plaintiff was requested to assist Kinney in any way she could to help Kinney learn the various divisions of wall papers and other aspects of the job. Plaintiff did so.

28. On July 12, 1969, less than six weeks after Kinney was hired, Dwoskin hired Joan Baxter, a black female, to work temporarily as sample room girl and maid for six days so that the plaintiff could work in showroom sales with the showroom manager.

29. Plaintiff worked in the position of showroom sales from July 12, 1969 to July 18, 1969 along with Jill Kinney. During this period plaintiff received her regular wages as sample room girl, whereas Kinney, who had been employed for less than six weeks, received her

base salary plus the regular commissions on any sales she made. The commissions on the sales made by the plaintiff were credited to either Huntley, who was on maternity leave, or Price, who was on vacation.

30. The reason assigned by the defendants for not giving plaintiff the commissions on sales she made from July 12, 1969 to July 18, 1969 is that it is not their policy to assign a sales number unless there was a permanent position or the position was to remain open for a month or more.

31. In the July, 1969, employee publication of the defendants entitled "Rollins Today", the plaintiff, in the introductory paragraph to a letter she had written, was referred to as a "showroom salesgirl" when in fact her title was "sampleroom girl." The defendants made no efforts to correct this misstatement of fact.

32. In late August, 1969, branch manager Vale knew that Huntley would not be returning and a permanent sales position became available. Vale decided to give the position to Kinney rather than to the plaintiff even though Vale had received no complaint or criticism about plaintiff's performance in sales work during the week she worked in the position in July, 1969. Thus plaintiff actually demonstrated her qualifications for a sales position.

33. On July 8, 1969, plaintiff, while still employed by Dwoskin, filed a charge with EEOC alleging discrimination because of race because prior to the time Huntley and Kinney were hired, she had tried to get a sales position and had been rejected. On that charge plaintiff stated "June 4, 1969" as the most recent date on which she had been discriminated against. During the course of the investigation by EEOC, plaintiff filed an additional charge on which she stated that the unlawful discrimination against her was "continuing".

34. After plaintiff had filed her charges with EEOC, Vale, the branch manager, had a discussion with the plaintiff about the charges.

35. On January 16, 1970, approximately six months after plaintiff had filed her first charge with EEOC, the defendants fired the plaintiff. The reason for termination stated on the plaintiff's termination slip was "Would not perform duties hired for". In their answer to the complaint, filed on or about March 17, 1973, Dwoskin and Rollins asserted that "plaintiff was not discharged," but voluntarily resigned on or about January 16, 1970. At the trial, additional reasons for plaintiff's discharge were asserted by the defendants: (1) the branch manager felt that he had lost the ability to reprimand plaintiff after she had filed charges with EEOC; (2) plaintiff's work performance went downhill after she had filed the charges with EEOC; (3) there were arguments between the plaintiff and showroom personnel; and (4) the plaintiff was absent approximately a week and three days or two full work weeks prior to her discharge. Of all the various reasons asserted by the defendants for plaintiff's discharge, the main reason was the alleged absence of the plaintiff prior to her termination.

36. Plaintiff testified that on the day she was discharged she was called into the branch manager's office and was told that the company was dissatisfied with her work, that he felt the plaintiff was dissatisfied with Dwoskin and that he thought she would be better off some place else. Plaintiff further testified that it is possible that she may have been absent the day before she was terminated, but stated that it was her practice to notify Dwoskin if she did not expect to come to work.

37. Based on the conflicting evidence about the circumstances surrounding plaintiff's discharge, the court finds as a fact that the defendants discharged plaintiff in whole or in part because of

her race and because she had filed charges with the EEOC for the following reasons:

(a) The conflicting reasons asserted by Dwoskin in its answer to the complaint and the reasons assigned at trial. See finding No. 35, *supra*.

(b) The testimony of Vale who testified that he felt that he had lost his ability to reprimand the plaintiff because she had filed a charge with EEOC and that the only way he could reprimand plaintiff for failure to perform her duties was to fire her.

(c) The defendants failed to make or keep pertinent records relating to plaintiff's termination, even though prior to the termination, the plaintiff had filed charges with EEOC which were still pending at the time and EEOC had undertaken its investigation of the charge prior to plaintiff's termination.

(d) The defendants made no efforts whatsoever to find out why plaintiff *may have* been absent prior to her termination.

38. Plaintiff actively sought other employment after she was fired by Dwoskin. She applied for sales positions at Belk, Woolco, Eagle Stores and Family Dollar Stores. Plaintiff did not secure employment after she was fired by the defendants until the latter part of 1972 when she was employed in a sales position at Belk for the Christmas holidays.

39. Plaintiff was refused employment at Eagle Stores at which she applied for employment in the summer, 1970, because she had listed Dwoskin on her application as a previous employer. The interviewer at Eagle Stores refused to hire the plaintiff after he had talked with personnel at Dwoskin and was advised that plaintiff would probably file a charge with EEOC if she was employed as she had filed an EEOC charge against Dwoskin.

40. Plaintiff's income from her employment as a sample room girl with Dwoskin from May, 1968 until she was discharged on January 16, 1970, was as follows:

| | |
|---|---|
| 1968 | $1,745.20 |
| 1969 | 3,173.27 |
| 1970 | 171.64 |

She had no other income from any other source of employment during this time.

41. The income received by the showroom manager [Price] for each of the calendar years listed below was as follows:

| | |
|---|---|
| 1968 | $9,218.94 |
| 1969 | 9,342.91 |
| 1970 | 8,129.04 |
| 1971 | 1,427.37 |

Price testified that other showroom sales persons earned about 20% less than she did for years listed above.

42. Plaintiff filed charges with EEOC on July 8, 1969, and on July 18, 1969. By letter dated December 1, 1973, EEOC notified plaintiff of her right to institute a civil action in an appropriate federal district court within ninety days of receipt of said letter. Plaintiff filed her complaint in this court on February 22, 1974, within ninety days of receipt of the appropriate notice from EEOC.

43. The court finds as a fact that the plaintiff has carried her burden of proof of demonstrating by a preponderance of the evidence that she was qualified for a position with Dwoskin as a showroom sales person; that vacancies existed to which she could have been promoted; and that she was denied a promotion to the position because of her race.

44. The court also finds as a fact that the plaintiff suffered economic loss because of the refusal of the defendants to promote plaintiff to showroom sales because of her race. The plaintiff suffered further economic loss because the defendants discharged her because she had filed charges of unlawful employment discrimination with EEOC and because of her race.

■ 45. The evidence does not show the date on which Linda Huntley was initially employed into showroom sales[4]; however, she had been employed some time between July 22, 1968 and November, 1968. See Finding No. 19, supra. The court is of the opinion, therefore, that the period for which back pay for the plaintiff should be allowed is from August 1, 1968 through and including December 31, 1972.

■ 46. Because there is no other data available from which back pay for plaintiff can be computed, such as the income actually earned by Huntley and Kinney, either because such data has been either lost or destroyed, the back pay award for the plaintiff should be the difference between what the plaintiff actually earned at Dwoskin prior to her discharge, or what she actually earned or could have earned since her discharge earnable with reasonable diligence, and eighty percent (80%) of the income actually earned or which could have been earned by Mary Price with Dwoskin during the applicable period for which back pay is to be allowed.

## CONCLUSIONS OF LAW

1. The court has jurisdiction of this action pursuant to Section 706(f) of the Civil Rights Act of 1964 [42 U.S.C. Section 2000e–5(f)] and under the Civil Rights Act of 1866 [42 U.S.C. Section 1981]. The defendants are employers engaged in an industry affecting commerce within the meaning of Section 701(b) of Title VII [42 U.S.C. Section 2000e(b)].

2. The plaintiff has complied with the jurisdictional prerequisite of Section 706 of Title VII for instituting this action [42 U.S.C. Section 2000e–5].

■ 3. The plaintiff has met her burden of proof regarding her allegations by a preponderance of the evidence that she was discriminated against by the defendants because of her race in vi-

olation of Title VII and Section 1981 by showing (i) that she belongs to a racial minority; (ii) that she applied for and was qualified for the position of showroom sales person for which Dwoskin sought applicants; (iii) that, despite her qualifications for the position, she was not offered the position on a permanent basis; and (iv) that after plaintiff's rejection, Dwoskin hired white persons who were no more qualified for the position than the plaintiff. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668, 677 (1973). See *Young v. Edgcomb Steel Co.*, 499 F.2d 97 (4th Cir. 1974); *Brown v. Gaston County Dyeing Machine Co.*, 457 F.2d 1377, 1379 (4th Cir. 1972).

4. Plaintiff's statistical evidence further supports her claim for relief that she was refused a showroom sales position because of race, particularly the evidence establishing that all of the showroom sales persons at all times here material have been white and that all of the persons hired as sample room girls have been black. See *Brown v. Gaston County Dyeing Machine Co., supra* at 1380–1382.

5. The defendants have failed to carry their burden of articulating some legitimate, nondiscriminatory reason for their refusal to promote the plaintiff to a position in showroom sales. *McDonnell Douglas Corp. v. Green, supra.*

■ 6. The plaintiff was discharged in whole or in part because she filed charges with EECO against defendant Dwoskin. See *Pettway v. American Cast Iron Pipe Co.*, 411 F.2d 998 (5th Cir. 1969); *Barela v. United Nuclear Corp.*, 462 F.2d 149, 151, 152 (10th Cir. 1972). See also *Smith v. Sol. D. Adler Realty Co.*, 436 F.2d 344, 349–350 (7th Cir. 1970) (race need not be the sole reason for the unlawful activity).

7. Although the defendant introduced evidence tending to show that plaintiff was reprimanded from time to

---

4. Records from which Huntley's employment date could have been established apparently have been destroyed.

time for tardiness and tending to personal business during her working hours, the defendant in no way attempted to demonstrate by this evidence that the plaintiff was any less qualified for a showroom sales position. Furthermore, this evidence may very well have served as the pretext for discharging the plaintiff because she had filed a charge against the defendant Dwoskin with EEOC. See *McDonnell Douglas Corp. v. Green, supra.*

8. The plaintiff has suffered economic loss as a result of refusal of the defendant to promote her to a showroom sales position. Therefore, plaintiff is entitled to back pay from the defendants and there are no special circumstances in this cause that would render unjust an award of back pay. See *Moody v. Albermarle Paper Co.,* 474 F.2d 134 (4th Cir. 1973) ; *Pettway v. American Cast Iron Pipe Co.,* 494 F.2d 211, 253–254 (5th Cir. 1974).

9. The plaintiff made reasonable efforts to mitigate her economic loss after she was discharged by Dwoskin by seeking employment elsewhere. Plaintiff's efforts were thwarted on at least one occasion because of the failure of Dwoskin to give her a favorable recommendation because she had filed charges with EEOC.

10. The wilful loss of earnings is an affirmative defense and the burden of proving it rests on the employer. See *Florence Printing Co. v. NLRB,* 376 F.2d 216 (4th Cir. 1967) ; *Pettway v. American Cast Iron Pipe Co.,* 494 F. 2d 211, 258–260 (5th Cir. 1974). The defendants have failed to show that the plaintiff wilfully refused to mitigate her damages after she was discharged.

11. Exactitude in computing back pay is not required and uncertainty in determining what the claimant would have earned but for the unlawful employment practice should be resolved against the discriminating employer. *Pettway v. American Cast Iron Pipe Co.,* 494 F.2d 211 at 260–261; *Johnson v.* *Goodyear Tire and Rubber Co.,* 491 F.2d 1364, 1380, n. 53 (5th Cir. 1974).

12. Plaintiff is entitled to recover her costs and reasonable attorneys' fees as part of her costs.

## JUDGMENT

Based on the foregoing Findings of Fact and Conclusions of Law it is hereby ordered, adjudged and decreed:

1. That the defendant Dwoskin offer the plaintiff the next vacancy in showroom sales that becomes available at its Charlotte branch next occurring after the entry of this judgment.

2. That the plaintiff be and is hereby awarded back pay against the defendants for the period since August 1, 1968.

3. That the back pay award is to be a sum which is the difference between what the plaintiff actually earned at Dwoskin prior to her discharge on January 16, 1970 and what she actually earned or could have earned subsequent to her discharge, with reasonable diligence, and eighty percent (80%) of what Mary Price actually earned or could have earned at Dwoskin during the applicable period.

4. That interest in the amount of 6% per annum be and is hereby allowed on the accrued back pay.

5. That the plaintiff be and is hereby awarded her costs in this action including reasonable attorneys fees and expenses.

6. Counsel for the parties are directed to meet and confer within fifteen (15) days of the entry of this order for the purpose of fixing or agreeing upon the amount to be awarded as back pay pursuant to the formula set out herein. Absent an agreement by the parties, the plaintiff will notify the court within twenty (20) days of the entry of this judgment and the court will thereafter enter an order fixing the dollar amount of the back pay award.

7. Counsel for the parties are also directed to meet and confer within fifteen (15) days of the entry of this judg-

ment for the purpose of agreeing upon costs, attorneys fees and expenses. Absent such an agreement, (1) counsel for the plaintiff is directed to file with the court a statement of time for which attorneys' fees are claimed and an itemization of costs and expenses; (2) the defendants are directed to file a statement with the court setting forth the bases on which they have compensated their counsel. The respective statements required herein shall be filed within twenty (20) days of the entry of this Judgment.