**Paul MULLER, Plaintiff-Appellee,**

**v.**

**UNITED STATES STEEL CORPORATION, Defendant-Appellant.**

**No. 74–1161.**

United States Court of Appeals, Tenth Circuit.

Argued Nov. 13, 1974.

Decided Jan. 14, 1975.

Rehearing Denied Feb. 5, 1975.

James B. Lee and Daniel M. Allred, Parsons, Behle & Latimer, Salt Lake City, Utah, for defendant-appellant.

Stephen G. Morgan, Morgan, Scalley, Lunt & Kesler, Salt Lake City, Utah, for plaintiff-appellee.

Before SETH, BARRETT, and DOYLE, Circuit Judges.

WILLIAM E. DOYLE, Circuit Judge.

United States Steel seeks reversal of a judgment rendered by the United States District Court for the District of Utah in favor of the plaintiff Muller. The court adjudged that the Steel Company had discriminated against Muller in its promotion policies in violation of Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e–2(a).

The main contention of United States Steel is that the evidence at trial was legally insufficient to establish that the plaintiff was a victim of discriminatory employment practices toward plaintiff. So, our primary inquiry is whether appellant company discriminated and whether appellee was shown to have been discriminated against. There are other contentions which will be enumerated and discussed.

The plaintiff is of Spanish-American origin. He commenced working for United States Steel in 1955 and continued until August 6, 1969. At present he lives and works in Albuquerque, New Mexico. He has not sought reinstatement.

Plaintiff was employed at the Geneva Plant of United States Steel near Orem, Utah. His employment was in the large diameter pipe mill. It was the admitted failure of the company to promote plaintiff to a supervisory position which led to the filing of this case.

The lowest supervisory position in the mill is the turn foreman. If such a foreman is replaced by a production employee on a temporary basis, he is given the position of spell foreman but is still paid by the hour. Generally speaking, in order for a production employee to become a turn foreman he must have previously served as a spell foreman. The spell foreman is selected from the shift in which a vacancy occurs in a particular area of the mill. There are three such areas in the large diameter mill—the O.D. or hot line area, the I.D. area and the finishing area. Muller's main qualifications, according to his testimony, were in the O.D. or hot line area.

The selection of a spell foreman is made by the general foreman, whose decisions are for practical purposes final, although not necessarily so, for there exist no definite recognized criteria which govern the selection of a spell foreman. The general foreman consults the area foremen who review the names on the crew schedule. The general foreman in making the selection considered the recommendation of the area foreman, the ability of the individual to perform his work, his ability to get along with people, leadership ability, promptness, attitude toward the work and, finally, experience. Such jobs are not published and thus the qualifications are not set forth in writing. Complaint is made that the

vagueness of the criteria lends itself to discriminatory practices.

The population of the county from which the company draws its labor force was 137,776 in 1970 of which 2,596, or about 1.88%, were, according to the Census Bureau, Spanish language or origin persons. However, the percentage of persons of Spanish origin who are employed in the whole facility is far lower than the county-wide percentage. This is apparent from the columnar analysis which is shown below.[1]

From these figures it is also possible to infer for the purposes of the pipe mill, at least, that the Spanish origin people are not to any marked degree under-employed. It is somewhat different, however, when promotions are considered. Mr. Muller, for example, though employed in the pipe mill for fourteen years, was never chosen as a spell foreman and no other Spanish-American person had been chosen since at least 1963. Muller has testified that he was in some cases assigned to the I.D. area instead of the O.D. area or hot line area and that militated against his being eligible for spell foreman in the hot line area. In any event, during 1968 and 1969 the evidence showed that about 20–25 employees were selected as spell foremen, and in every instance these were persons of Anglo origin. Fifteen of this number had more seniority than Muller. There were 20 other employees who had more seniority than Muller who, like Muller, were never selected as spell foremen.

The evidence further showed that Muller had five years of welding experience prior to going to work for the defendant.

He completed his high school education and a course in welding during his employ. He also was shown to have undertaken leadership responsibilities in the community.

The instant charges were filed with the Utah Anti-Discrimination Department on December 29, 1968 and January 28, 1969. No action was taken. In July 1969 the large diameter mill shut down and Muller worked as a laborer. Just prior to the shutdown he worked as an arc welder. On August 6, 1969, he terminated his employment and moved to Albuquerque. His testimony was that the cause of this was the unfair and discriminatory treatment he received at the plant.

Trial was had starting February 8, 1974. The district court found that the promotional system violated Title VII in that it lent itself to discrimination and was not shown to have been the product of business necessity. The court went further. It found that Muller in addition had been constructively discharged from his job in that Muller's resignation was not a matter of free choice; that it resulted from discrimination. An award of $26,624.35 in back pay was made plus $14,000 in attorneys' fees. Injunctive relief was also granted, notwithstanding that this was not a class action. Defendant was ordered to take affirmative steps to adopt a non-discriminatory promotional system together with meaningful standards.

The Steel Company's main contentions are, *first*, that the court erred in granting judgment for the plaintiff because of the absence of a finding that plaintiff

| 1. | Date | Geneva Works Total | Geneva Works Spanish-American | Pipe Mill Total | Pipe Mill S/A |
|---|---|---|---|---|---|
| | 1964 | 5,087 | 9 (.18%) | 340 | 3 ( .88%) |
| | 1964 | 4,856 | 11 (.23%) | 282 | 3 (1.06%) |
| | 1965 | 3,774 | 9 (.24%) | 331 | 3 ( .91%) |
| | 1966 | 4,617 | 10 (.22%) | 113 | 4 (3.54%) |
| | 1967 | 5,061 | 10 (.20%) | 420 | 4 ( .95%) |
| | 1968 | 4,751 | 23 (.49%) | 446 | 9 (2.02%) |
| | 1969 | 4,274 | 17 (.40%) | 91 | 6 (6.6%) |
| | 1970 | 4,472 | (Not reported) | 210 | 4 (1.9%) |
| | 1971 | 4,488 | 24 (.54%) | 115 | 2 (1.74%) |
| | 1972 | 4,395 | 26 (.60%) | 142 | 5 (3.5%) |
| | 1973 | 4,333 | 31 (.72%) | 276 | 2 ( .72%) |

himself was discriminated against. *Second*, the court's judgment is based on, so it is argued, the theory that opportunity to discriminate constitutes a violation of Title VII. *Third*, it is contended that the evidence is insufficient to establish discrimination against the plaintiff. Complaint is also made about the holding that there was a constructive discharge, and at last it is argued that the damages are excessive and that the court erred in issuing general injunctive relief since it was not a class action. Most but not all of the points urged will be reviewed.

I.

## WHETHER THE EVIDENCE ESTABLISHED THAT PLAINTIFF WAS DISCRIMINATED AGAINST ON THE BASIS OF HIS ETHNIC ORIGIN

Plaintiff-appellee's complaint is that the failure to appoint him as spell foreman constituted a violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2.[2] The Steel Company maintains that the statistics are inconsequential pointing out that the number of Spanish origin persons in the community is small and that it employs a representative percentage. However, the cases hold that this is not sufficient to disprove discrimination; that deprivation of employment opportunities can also exist as a result of failure to promote.[3]

The use of statistics capable of raising inferences of employment discrimination is now a well recognized aid in proof in cases of this type. One of the early definitive decisions in this field is that of our court in Jones v. Lee Way Motor Freight, Inc., 431 F.2d 245 (10th Cir.), cert. denied, 401 U.S. 954, 91 S.Ct. 972, 28 L.Ed.2d 237 (1970) applied in Spurlock v. United Airlines, 475 F.2d 216 (10th Cir. 1972). There the employer had two categories of truck drivers. These were line or over the road and, secondly, city drivers. The line driver positions were superior in that they paid higher wages and had other benefits as well. The two categories were treated in separate union contracts and there was a non-transfer policy from city driver to line driver. The plaintiffs in *Jones* were black persons and city drivers who had sought and been denied transfer. The allegation of the complaint was that the application of the rule, although on its face it appeared as a neutral non-transfer policy, in practice discriminated against them. The decision was that the evidence sufficiently established that the effect of the policy was discrimination since no Negro had been appointed as a line driver between 1964 and 1968. All black drivers were city drivers and, although there were some white drivers in the city category, the vast majority of the total white drivers were in the line category.[4]

---

**2.** That section provides:

It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

**3.** Baxter v. Savannah Sugar Refining Corp., 495 F.2d 437 (5th Cir. 1974); United States v.

N. L. Industries, Inc., 479 F.2d 354 (8th Cir. 1973); United States v. St. Louis-San Francisco Ry. Co., 464 F.2d 301 (8th Cir.), cert. denied, 409 U.S. 1107, 1116, 93 S.Ct. 900, 34 L.Ed.2d 687 (1972); Brown v. Gaston County Dyeing Machine Co., 457 F.2d 1377 (4th Cir.), cert. denied, 409 U.S. 982, 93 S.Ct. 319, 34 L.Ed.2d 246 (1972); Rowe v. General Motors Corp., 457 F.2d 348 (5th Cir. 1972); Marquez v. Omaha Dist. Sales Office, Ford Div. of Ford Motor Co., 440 F.2d 1157 (8th Cir. 1971); Jones v. Lee Way Motor Freight, Inc., 431 F.2d 245 (10th Cir.), cert. denied, 401 U.S. 954, 91 S.Ct. 972, 28 L.Ed.2d 237 (1970).

**4.** On this the court said:

The company argues that because the no-transfer policy locks in white as well as Negro city drivers, it is not discriminatory. Roughly 80% of the white drivers were employed as line drivers. The 20% hired

In reversing the judgment of the district court the opinion of this court recognized that the existence of a superficially neutral policy did not serve as a sufficient explanation; that it had an inherently discriminatory effect. It was recognized in the court's opinion authored by Judge Breitenstein that the statistics constituted a prima facie case which required the employer to affirmatively show that business necessity required continuation of the policy.[5] The showing of the company was held to be insufficient.

The standards employed in *Jones* were fully recognized in our subsequent decision, Spurlock v. United Airlines, *supra.* In addition, it was there pointed out that specific intent to discriminate was not necessary; that it was sufficient if discriminatory criteria were employed deliberately and not accidentally.

In the case at bar the statistics are less dramatic than were those in *Jones* particularly as to discrimination in the hiring of Spanish-Americans. However, we view the methods employed in promotions as sufficient to establish a prima facie case. Also, the *statistics* were sufficient to shift the burden of going forward with the evidence to the employer.

There is an added factor here and that is the existence of vague and inconclusive criteria in promotion decisions. We refer to the selection of the spell foreman being made by the general foreman in his uncontrolled discretion. True, he must have the approval of his superiors but disapproval from this source is rare. The big element in the general foreman's decision is the recommendation given by the front line foreman.

Plaintiff-appellee relies on statistical facts and emphasizes especially that no Spanish-American has ever been promoted to the position of spell foreman or temporary foreman, the essential step to becoming a supervisory employee.

The Company asserts that one person of Spanish-American ancestry is a foreman. But this does not prove a lack of discrimination because this individual was not *promoted* to the position. He was transferred as foreman from the West Coast plant of United States Steel.

Opposed to the lack of evidence of promotion of Spanish origin persons, the record shows that appellant promoted 20–25 persons of Anglo origin to the position of spell foreman during the year 1968–69 alone. It is surprising that not a single Spanish person was assigned to this position during this same period. While these statistics are not overwhelming, they are not to be ignored.

■ The law is clear that a plaintiff in a job discrimination case need not prove that the employer had a specific intent to discriminate. It is sufficient that the employer's conduct produced discriminatory results. *See* Jones v. Lee Way Motor Freight, *supra.* *See also* Spurlock v. United Airlines, *supra.* Where, as here, there are circumstances showing discrimination, a prima facie case exists. At bar there is the added factor—the lack of meaningful standards

as city drivers presumably had the opportunity to apply as line drivers but either were not qualified or preferred city work. In any event, race was not a determinative factor in their employment as city drivers, as it was with the Negroes. Although the no-transfer provisions may have the same ultimate effect on both white and Negro city drivers, the difference in the factors underlying their initial employment as city drivers is sufficient to make the policy discriminatory as to the latter but not the former.

431 F.2d at 249.

5. The court's further statement was:

The remedial nature of Title VII requires the adoption of the business necessity test.

If employers or unions could pursue, upon a showing of mere rationality, neutral policies which have the effect of perpetuating past discrimination, the value of the principles developed in Quarles and subsequent cases would be eroded. When a policy is demonstrated to have discriminatory effects, it can be justified only by a showing that it is necessary to the safe and efficient operation of the business. *See* Local 189, United Papermakers and Paperworkers v. United States, *supra*, 416 F.2d [980] at 989. Id.

to guide the promotion decision, whereby there is some assurance of objectivity. Such personal and subjective criteria encourage and foster discrimination.

■ And where, as here, the results give a strong indication that discrimination is being practiced, the cases condemn subjective standards which United States Steel had in this case. *See* United States v. N. L. Industries, Inc., 479 F.2d 354 (8th Cir. 1973); Brito v. Zia Co., 478 F.2d 1200 (10th Cir. 1973); Brown v. Gaston County Dyeing Machine Co., 457 F.2d 1377 (4th Cir. 1972); Rowe v. General Motors Corp., 457 F.2d 348 (5th Cir. 1972); Parham v. Southwestern Bell Tel. Co., 433 F.2d 421 (8th Cir. 1970); United States v. Sheet Metal Workers, Local 36, 416 F.2d 123 (8th Cir. 1969).

Rowe v. General Motors Corp., *supra*, is a case which like ours involved vague standards. The standards there applied to the transfer of employees from jobs paying hourly wages to salaried jobs. The Fifth Circuit delineated five aspects of the defendant's transfer methods. These were:

(i) The Foreman's recommendation is the indispensable single most important factor in the promotion process.

(ii) Foremen are given no written instructions pertaining to the qualifications necessary for promotion. (They are given nothing in writing telling them what to look for in making their recommendations).

(iii) Those standards which were determined to be controlling are vague and subjective.

(iv) Hourly employees are not notified of promotion opportunities nor are they notified of the qualifications necessary to get jobs.

(v) There are no safeguards in the procedure designed to avert discriminatory practices.

*Id.* 457 F.2d at 358–359.

More important, the court held that these factors in addition to the statistical indicia of the presence of discrimination made out a prima facie case. In our case the standards were equally vague and subjective. This plus the fact that no person of Spanish-American origin was, as far as we know, ever promoted are enough in our case also to establish a prima facie case that defendant-appellant unlawfully discriminated against Spanish-Americans and against the plaintiff-appellee.

## II.

## WHETHER BUSINESS NECESSITY EXISTED

The remaining liability issue is whether these actions were justified. In the leading case on this defense, Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), the Supreme Court said that unless an exclusion rule is related to job performance it is prohibited. From this the doctrine of business necessity has developed. Under it the employer may rebut a prima facie case of the employee by showing that the maintenance of safety and efficiency requires the practice which obtains. Thus, in Spurlock v. United Airlines, *supra*, the plaintiff had alleged that he had been discriminated against when he was not given a job as a flight officer. The defendant was able to counter with specific criteria which had been required of all flight officers such as a college degree, a commercial pilot's license, 500 hours of flight time and age between 21 and 29 years old. The court held that the failure of the applicant to meet these justified his rejection in the interest of safety and efficiency.

Other cases enunciate this business necessity doctrine in a more limited manner. The Second Circuit has held that the doctrine must mean more than transfer and seniority policies serve legitimate management functions. The court went on to say that if the ends of safety and efficiency are served by a reasonably available alternative method having less discriminatory effects, "then the present policies may not be continued." United

States v. Bethlehem Steel Corp., 446 F.2d 652 (2d Cir. 1971). *See also* United States v. St. Louis-San Francisco Ry. Co., 464 F.2d 301 (8th Cir.), cert. denied 409 U.S. 1107, 1116, 93 S.Ct. 900, 34 L.Ed.2d 687 (1972); United States v. Jacksonville Terminal Co., 451 F.2d 418 (5th Cir. 1971); Robinson v. Lorrilard Corp., 444 F.2d 791 (4th Cir.), cert. denied, 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655 (1971).

■ United States Steel has not shown business necessity or any other justification for its failure to promote plaintiff and other Chicano people to the position of spell foreman. It has not been shown that efficiency or safety or any other of the company's interests are served by this system which depends on hunch judgments rather than specific criteria. Judged by any of the mentioned standards, then, the prima facie case of Muller has not been rebutted.

■ The Company also argues that, even assuming the existence of discrimination, Muller failed to prove that he was personally discriminated against. It is said that the people who were appointed were all more competent than Muller. Here again there is no basis for so concluding where there is a palpable lack of objective standards. The trial court found that Muller was not considered for the position, notwithstanding his long seniority and despite the fact that he had clearly held the highest ranking position below the spell foreman and had requested consideration. It cannot be said in view of the results and the lack of criteria that the trial judge's ultimate holding that Muller had been discriminated against was clearly erroneous.

## III.

### WAS THERE A CONSTRUCTIVE DISCHARGE OF PLAINTIFF?

■ In our opinion the ruling that constructive discharge took place was error. This doctrine exists when an employer deliberately renders the employee's working conditions intolerable and thus forces him to quit his job. *See* J. P. Stevens & Co., Inc. v. NLRB, 461 F.2d 490 (4th Cir. 1972). Plaintiff would have us rule that the Steel Company's refusal to consider him as spell foreman and its assignment of him to an area which made it impossible for him to become spell foreman created intolerable conditions which satisfied the requirement of constructive discharge. We are persuaded, however, that his reassignment and the other actions complained of were not designed to coerce his resignation. True, just prior to his resignation he was downgraded to laborer, but this was a result of the large diameter mill closing temporarily.

We are not saying that this constructive discharge doctrine which developed in labor cases is inapplicable to civil rights cases. *Cf.* Colorado Civil Rights Com'n v. State, 30 Colo.App. 10, 488 P.2d 83 (1971). In the *Stevens* case, *supra*, there was evidence that an employee who had favored the union during an organizing effort was harassed by management and the court had no difficulty finding a constructive discharge. This has been found in other cases. *See* for example NLRB v. Century Broadcasting Corp., 419 F.2d 771 (8th Cir. 1969) and NLRB v. Tennessee Packers, Inc., Frosty Morn Div., 339 F.2d 203 (6th Cir. 1964). In each of these cases there was extrinsic evidence to establish that an effort had been made to render the job so unattractive and unpleasant as to justify the finding that the resignation was a constructive firing.

An example of a case in which the evidence was inadequate was Steel Industries, Inc. v. NLRB, 325 F.2d 173 (7th Cir. 1963), wherein it was said that the evidence did not even establish a strong suspicion as to the existence of a scheme to get rid of the employee in question. Similarly, in the present case, there is a dearth of evidence to show a deliberate effort to make things difficult for the employee so as to bring about his separation. Hence, the proof of constructive discharge fails.

## IV.

### EFFECT OF THE FAILURE OF THE CONTENTION OF CONSTRUCTIVE DISCHARGE ON THE DAMAGE AWARD

Unless appellant was constructively discharged, he would not be entitled to damages in the form of back pay, interest and retirement from the date of leaving the Steel Company's employ. His damage would be measured by the difference between actual pay and the amount he would have made if he had been chosen as spell foreman during the period from September 17, 1967 until he quit, August 6, 1969. There is no evidence in the record which could be used for this purpose. Hence, this will necessitate remand. The Steel Company says that the damages were excessive even if there was a constructive discharge. The court applied the formula testified to by an expert witness, Mr. Caldwell. Defendant's evidence consisted of the pay record of an employee who was only slightly senior to Muller. It claimed that since Muller had less seniority he could not have earned more than this other employee. This is one point which we need not consider.

The Steel Company makes the added contention that Muller's award cannot be based on the 1968–69 base period because if he had not quit he would have worked in lower paying jobs and would have been laid off more often. We do not believe, however, that these figures for the period in question were erroneously adopted by the court in the face of the inconsequential evidence offered by the company.

■ In our view, the granting of general injunctive relief applicable to the entire class was not appropriate because the plaintiff had not sought prospective injunctive relief for himself. Therefore, no basis existed for such relief as to the other persons who had not asserted claims of this nature. In any event, a consent decree has been entered in a suit brought by the United States and, therefore, virtually the same relief was given.

We see no occasion for an injunction or ancillary remedy in this case.

■ It is our conclusion, then, that the judgment of the district court should be affirmed in part and reversed in part and that the action should be remanded for further proceedings consistent with the views expressed herein. It is our further conclusion that the attorney's fee is excessive in view of the action which we have taken, and it is ordered that this part of the judgment be also vacated and reconsidered in the light of the results achieved. It is so ordered.