Cicero W. HAYDEN, Plaintiff,

v.

CHRYSLER CORPORATION, a Foreign Corporation, Defendant.

Civ. A. No. 77–70022.

United States District Court, E. D. Michigan, S. D.

Feb. 22, 1980.

Philip Green, Colista, Green, Green & Adams, Detroit, Mich., for plaintiff.

Henry Saad, Dickinson, Wright, McKean, Cudlip & Moon, Detroit, Mich., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

ANNA DIGGS TAYLOR, District Judge.

Plaintiff, a black male former employee of the defendant corporation, filed his complaint in this action on January 2, 1977. A Right-to-Sue letter dated October 7, 1976, from the United States Equal Employment Opportunity Commission, was attached as an exhibit thereto. The jurisdiction of this court is invoked of plaintiff's claim of violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., as well as of 42 U.S.C. § 1981. Pendent jurisdiction of the court of alleged violations of plaintiff's rights under the Constitution and laws of the State of Michigan is also invoked. The court finds that its jurisdiction of this matter is proper.

Trial was held on February 12 and 13, 1980. At that time, plaintiff voluntarily dismissed his claim under 42 U.S.C. § 1981. He presented three witnesses: himself, a representative of the Michigan Civil Rights Commission, and his former union committeeman, Clyde Adkins. At the close of the plaintiff's case, defendant moved to dismiss pursuant to Rule 41(b), F.R.C.P., on which motion the court reserved ruling. At that point defendant rested, presenting no evidence. The one witness whom defendant had listed in the Final Pre-trial Order, Mr. T. S. Stacy, who was present throughout trial at counsel table, was introduced to the court by defendant's counsel as defendant's labor representative.

Plaintiff's claim is that he was the victim of retaliatory adverse treatment by defendant because he sought to vindicate his civil rights; of racial discrimination in the conditions of his employment; of discriminatory failure to promote; and of constructive discharge under circumstances of racial discrimination. No evidence was presented concerning a failure to promote, and the court considers that claim to have been abandoned.

The court finds that plaintiff was hired by defendant Chrysler Corporation as a maintenance electrician at its Jefferson Avenue, Detroit plant on September 30, 1968. Plaintiff had learned the electrician's trade in the Navy during the 1950's and had also been employed as an electrician at the Great Lakes Steel plant, after which he had stopped work and attended school. In 1968, he had again begun job-seeking, and had seen defendant's advertisement for maintenance electricians for its Jefferson Plant, in a Detroit daily newspaper. He then had presented himself at the personnel office and been told that there were no more vacancies. Subsequently, he saw another identical advertisement by the defendant. He had thereupon filed a complaint against defendant with the Michigan Civil Rights Commission (which the commission's representative identified at trial as Complaint # 5079 E.M., dated September 26, 1968); and had shortly thereafter been telephoned by defendant's personnel office to report to work at the Jefferson plant. Thus began the relationship between these parties. Plaintiff was assigned to the afternoon shift.

On April 29, 1969, plaintiff filed his second complaint against defendant with the Michigan Civil Rights Commission because, although he was possessed of a journeyman electrician's card, he was paid by defendant at a lower hourly rate than were the other maintenance electricians of identical qualification. That matter (MCRC file # 6537 E.M.) was also resolved in plaintiff's favor, after Civil Rights Commission intervention, by the increase of his hourly rate and payment of a retroactive differential award.

The on-the-job supervisory harassment to which plaintiff had also been subjected from the inception of his employment with defendant increased, after his second resort to the State Civil Rights Commission. This harassment "followed a pattern" of supervisors assigning him to a task, rendering his performance of the task impossible or almost so, and of accusing him of incompetence and disciplining him for whatever delay or problem then developed. He was assigned, for example, to rewire a car wash motor but not permitted to turn the motor off or stop the water in order to do so. He was then suspended for untimely completion of the task. He was told to use tools or materiel which then became unavailable; and when he resorted to the production area for bolts, he was warned that theft accusations could result from such a practice.

During the years 1968 through 1970, supervision of the 70 to 80 plant maintenance electricians at Jefferson Avenue was all white, as it is today. Four of those electricians were black then, and that number remained constant up to the massive layoffs of fall, 1974. Plaintiff felt that his general foreman, Mr. Graham, was behind the harassment. Indeed, on August 30, 1969, Graham gave plaintiff a 30-day suspension without pay for "violent bumping," after Graham had opened a door into plaintiff's back. The suspension was set aside through the United Auto Workers' contractual grievance procedure, and back pay was awarded to plaintiff.

On September 16, 1970, plaintiff filed his third complaint with the Michigan Civil Rights Commission, # 10061 E.M., for harassment and unfair discipline because of his race. That complaint was still pending during the events which are the subject of this lawsuit, and was not closed until entry of a consent order in February of 1978.

Plaintiff had, prior to each post-hire resort to the Michigan Civil Rights Commission, and on the occasion of the "violent bumping", first gone to Mr. T. S. Stacy, defendant's labor representative at trial of this case, to attempt to resolve the problem of his discriminatory treatment "in the family." Nothing whatsoever was ever done about his situation prior to governmental, and in one instance union, intervention. Plaintiff also went to Mr. Stacy's "boss" in labor relations, to no avail, about the harassment to which he was subjected. In 1971, however, the harassment quieted down. Plaintiff went to a Mr. Robinson at the Civil Rights Commission, who placed a telephone call to defendant's Highland Park World Headquarters, and it became a laughing matter in the shop that he might "go to civil rights." Things continued in this manner until Thanksgiving of 1974 when plaintiff, with thousands of other Chrysler workers, was laid off. He had never yet had the opportunity to work a day shift. Shifts, at all time pertinent hereto, were chosen twice annually in order of seniority, except in extraordinary circumstances, which will be discussed later.

After the 1974 layoff, plaintiff was first recalled by defendant on April 22, 1975, to its Hamtramck plant. Acceptance of recall to that facility would have meant the loss of his seniority for future layoff purposes, so he refused it. Recalls from layoff are conducted in order of seniority. Plaintiff was then recalled to the Jefferson Avenue plant on April 28, 1975. This was the facility at which he held his seniority. Inasmuch as plaintiff had obtained interim employment as a maintenance electrician at the Parke-Davis Corporation, and timely reporting on April 28 at Chrysler would have required his quitting Parke-Davis without notice, he called defendant's labor office

and asked for a two-week extension of his recall, to permit him to give proper notice to his interim employer. This was refused, although plaintiff was given until Friday, May 1st, to report for work. Accordingly, he gave four-day notice to Parke-Davis, quit, and reported to defendant on Friday, May 1st. As the least senior man recalled in his classification, plaintiff was then on the cutting edge of any staffing change which defendant's labor office might make; and he remained in this vulnerable position to the end of the parties' relationship.

Monday, May 5, 1975, the second day of work, plaintiff's foreman told him he was laid off, again. It was explained to plaintiff and to his UAW committeeman, Clyde Adkins, by the labor office, that the return of a more senior electrician from sick leave necessitated this action. Adkins had never known such a two-day recall to happen, before or since. That afternoon, plaintiff reapplied and was rehired at Parke-Davis, where he worked the day shift.

Plaintiff was recalled again to defendant's Jefferson Avenue plant on May 20, 1975. He was again the least senior maintenance electrician, and again on the afternoon-evening shift. This time, he kept his job at Parke-Davis and told his foreman he would be late arriving until he had cleared up some personal business. He was at least an hour late, each day, and the foreman, Zyglantus, told him to clear up his affairs as soon as possible. Zyglantus had been one of plaintiff's foremen since his early days, had been signatory to one of plaintiff's employment reference forms for Parke-Davis, and had previously asked plaintiff how he liked his interim employment at Parke-Davis. Although plaintiff had not specifically told Zyglantus that the "personal business" was continued work for Parke-Davis, it was common knowledge in the shop that it was.

On May 30, 1975, foreman Zyglantus told plaintiff that, as the least senior man, he was assigned to the day shift the following morning. According to committeeman Adkins, when the sudden need for an additional employee on a different shift is determined by management to exist, it may make an immediate reassignment of the least senior person. Thereafter, the union may canvass the more senior electricians and, within five days, may demand that the person most entitled by seniority be assigned to the preferred shift. No such thing happened in this case, however. Plaintiff filed no grievance and requested no canvass. He simply never showed up at work again. It is also noted that there is no evidence in the record of any reason for the necessity of another electrician on the day shift.

Plaintiff testified that, because of all of the false allegations of incompetency that had been made against him at Chrysler, which he had been forced to disprove; because of all of the unfair personnel actions of Chrysler supervision, which he had been forced to obtain government intervention to rectify; and because he was still subject to the actions of the same management, and still subjected to an intolerable unfairness, in essence, he thought it best to continue his career at Parke-Davis. He abandoned his seven years of seniority under a United Auto Workers' contract, which he said was known to be the best in Detroit, and pursued the job at which he then had two months of seniority.

The record is not clear as to what economic losses resulted from this change, and the court makes no findings on damages, except for the fact that, since October of 1978, it is clear that plaintiff earned as much at the Ford Motor Company, his most recent place of employment, as he would have earned had he continued with defendant. But his compensation between May, 1975, and October, 1978, the period during which damages might have been sustained, is unclear. Plaintiff's hourly rate at Parke-Davis in May, 1975, was $7.38, including cost-of-living, and his fringe benefits there are unclear. The hourly rate which he left behind at Chrysler was $6.72, but quarterly cost-of-living was paid in a June 29, 1975 check for $302.40, and fringes included a dental plan.

On June 24, 1975, defendant's Mr. Stacy wrote plaintiff, pursuant to Article 49 of the UAW collective bargaining agreement, of his loss of seniority. His letter asked that plaintiff "please advise of any exceptional circumstances", and advised that plaintiff's union representative could be present for a discussion, if plaintiff requested. Plaintiff did not request a discussion.

Defendant argues that the allocation of proofs described in *McDonnell Douglas v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) requires that the plaintiff in a discriminatory retaliation case, to make a *prima facie* case, prove, (1) that he was participating in Title VII proceedings; (2) that the employer had knowledge of the participation; (3) that plaintiff was adversely treated subsequent to, or at the time of, such participation; and (4) that there is a causal link between his participation and his adverse treatment. The court finds that this plaintiff has established each of those four points by a preponderance of the evidence, thereby making a *prima facie* case, and that defendant, who presented no evidence, has failed to rebut that *prima facie* case. Plaintiff has presented far more facts than sufficient to sustain the inference that this employer's actions were motivated by impermissible considerations. *Mosby v. Webster College*, 563 F.2d 901 (8th Cir. 1977). Discriminatory animus will be inferred from the actions defendant has taken "because experience has proved that in the absence of any other explanation it is more likely than not those actions were bottomed on impermissible considerations." *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 576, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978).

Plaintiff's participation in civil rights enforcement proceedings on several well-justified occasions was clearly known by defendant's Jefferson Avenue management, up through Mr. Stacy's "boss" and indeed beyond, to World Headquarters. Moreover, the court notes that plaintiff's complaints were uniformly upheld after governmental or union investigations; that Mr. Stacy, to whom plaintiff always resorted first, did nothing on any occasion to relieve the abuses of plaintiff's rights occurring within his jurisdiction, and that the ultimate resolution of each of plaintiff's complaints resulted in some degree of expense, dislocation, and loss of managerial "face" within Mr. Stacy's labor relations realm. Plaintiff's last complaint against defendant's racial discrimination was still pending at the time of the adverse treatment here in litigation, and Mr. Stacy's knowledge of that fact is apparent. Stacy had been the court of first resort. Accordingly, the unrebutted evidence makes it abundantly clear that participation, employer knowledge, and a causal link with motivation were established.

It is also well established that plaintiff was the subject of discriminatory adverse treatment in his unique two-day recall, and in his subsequent unexplained reassignment, for the first time in his career with defendant, to a day shift.

The occasion of defendant's gradual recall of its work force from layoff placed plaintiff, at the time that his turn by seniority was reached, in a position particularly vulnerable to arbitrary (or discriminatory) decision-making by labor relations personnel. Mr. Stacy was once again placed in a position of leverage on plaintiff's work life, and once again the facts are clear that whatever leverage existed was utilized wherever possible against plaintiff's interest.

First, plaintiff was recalled when his seniority turn arrived, but to a plant which would not honor his seniority. If he had accepted it, the next layoff would have terminated him with Chrysler: but he did not. That was a particularly wise choice, because as it turned out he was eligible for recall at his home plant that same week. Inasmuch as there was no factual development of that peculiar event, the court does not rely upon it as evidence of retaliatory adverse treatment.

However, it was clearly unique, discriminatory, adverse treatment of plaintiff for the labor-personnel office, at the time of his April 28th two-day Jefferson Avenue recall, to insist that plaintiff leave another job on

four-day notice to return *only to replace a more senior worker on a brief sick leave.* Defendant's personnel office, if it knew that plaintiff's recall was to be for a period as brief as two days, had a duty to so advise him, when he had called and fully explained his circumstances. The more senior electrician returned long before the end of plaintiff's requested two-week notice period for Parke-Davis. If defendant was unaware of the more senior electrician who would soon be returning, it is very possible that there was none. There is, indeed, no such evidence, and it appears to the court that whether there was or was not, the reasons argued for the urgent two-day recall and the immediate layoff thereafter were pretextual for discriminatory adverse treatment, whether by reason of plaintiff's race, or because he was known to "go to civil rights." The fact that plaintiff would be returning at the cost of his other job was treated by defendant's personnel office with either reckless disregard or, more clearly, with deliberate retaliatory motive.

After plaintiff's second recall to defendant's Jefferson Avenue plant, he·was slow to quit the second job, as any reasonably prudent person would have been, prior to more closely ascertaining his security at Chrysler. It is clear to the court that the Chrysler job was preferable to the interim Parke-Davis position, because of the ·alacrity and full commitment with which plaintiff first responded to defendant's recall. It is equally clear that plaintiff's hesitance about quitting Parke-Davis again was generated by the likelihood that defendant might again arbitrarily render him completely unemployed. Accordingly, with the full actual knowledge of his co-workers and implied knowledge which the court will impute to supervision, he held the two jobs and was tardy daily for two weeks. The entire shop, including supervision, knew that plaintiff had been first recalled from a Parke-Davis job, that he had returned to Parke-Davis; and, the court concludes, knew that Parke-Davis was the "personal business" to which he was attending, during the day. Accordingly, plaintiff was again treated uniquely, adversely and, the court concludes, discriminatorily for reasons of retaliation and his race. He was assigned to the day shift . . . a privilege he had not previously enjoyed for the entire seven years of his tenure with defendant. Not even a pretextual business reason for the immediate need for another daytime electrician has been proffered.

Clearly, defendant had finally made continued employment intolerable to plaintiff; and plaintiff finally had an alternative. Rather than let that alternative go, and again place his future totally within. the obviously hostile hands of defendant's agents, he gave up and quit. Mr. Stacy's last *pro forma* letter regarding plaintiff's loss of seniority could hardly be regarded as anything but an offer of more of the same.

In *Young v. Southwestern Savings and Loan Assn.,* 509 F.2d 140 (1975), the Fifth Circuit wrote that:

> "The general rule is that if the employer deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation, then the employer has encompassed constructive discharge and is as liable for any illegal conduct involved therein as if it had formally discharged the aggrieved employee. See *N.L.R.B. v. Brennan's, Inc.,* 5 Cir. 1966, 366 F.2d 560; *J. P. Stevens & Co., Inc. v. N.L.R.B.,* 4 Cir. 1972, 461 F.2d 490; *N.L.R.B. v. Cavalier Olds, Inc.,* 6 Cir. 1970, 421 F.2d 1234 . . . . ." (at 144)

In that case, plaintiff was held to have made a *prima facie* case that she was constructively discharged because of her religious beliefs in violation of 42 U.S.C. § 2000e–2(a)(1), by her supervisor's intolerable requirement that she "close her ears" and remain present during the employer's devotional service. That employer, like this one, failed to rebut plaintiff's *prima facie* case with evidence that plaintiff could not have been accommodated without undue hardship on the conduct of its business. The court wrote, further:

> "This is precisely the situation in which the doctrine of constructive discharge ap-

plies; a case in which an employee involuntarily resigns in order to escape intolerable and illegal employment requirements." (at 144)

The Sixth Circuit, in *NLRB v. Tennessee Packers, Inc., Frosty Morn Division*, 339 F.2d 203 (1964), held that a retaliatory constructive discharge had occurred, where the respondent employer had deliberately made working conditions for a union activist intolerable, and wrote that:

"It is a well recognized rule in labor relations law that 'a man is held to intend the foreseeable consequences of his conduct. . . . ' " (at 205)

That the employer's conduct in that case had rendered the employee's resignation foreseeable also had rendered it intentional.

In *Muller v. U. S. Steel*, 509 F.2d 923 (10th Cir. 1975), the court referred to well settled law that a plaintiff in a Title VII job discrimination case need not prove that the employer had a specific intent to discriminate. It was held sufficient to a *prima facie* case that the employer's conduct produced discriminatory results. *Muller* also held that a constructive discharge occurs when the employer deliberately renders the employee's working conditions intolerable, forcing him to quit his job. Such a case is established, *Muller* held, where there is extrinsic evidence that an effort had been made to render the job so unattractive and unpleasant as to justify a finding that a resignation was a constructive firing. And *Pettway v. American Cast Iron*, 411 F.2d 998 (5th Cir. 1969), contains a full discussion of the proscription of 42 U.S.C. § 2000e–3(a) against discrimination against any employee who has opposed, made a charge of, or participated in an investigation of, any practice which is an unlawful employment practice under Title VII. Also see, *Ayon v. Sampson*, 547 F.2d 446 (9th Cir. 1976).

Again, in *Brown v. Rollins*, 397 F.Supp. 571 (W.D.N.C.1974), an employer was held liable under Title VII because plaintiff was discharged *in whole or* in *part* because she had filed charges with EEOC. The *Brown* court cites *Pettway; Barela v. United Nuclear Corp.*, 462 F.2d 149 (10th Cir. 1972);

and *Smith v. Sol Adler Realty*, 436 F.2d 344 (7th Cir. 1970), all for the proposition that race need not be the sole reason for defendant's activity for it to be unlawful.

■ This court concludes, on the basis of the facts found and law outlined above, that defendant has unlawfully discriminated against plaintiff in violation of 42 U.S.C. § 2000e–3(a) for plaintiff's opposition to defendant's practices constituting unlawful employment practices; and has discriminated against plaintiff in violation of 42 U.S.C. § 2000e–2(a)(1), by conduct constituting a constructive discharge because of his race, as well as for his seeking to enforce his rights.

■ Plaintiff is entitled to recover his attorneys' fees and costs. Uncertainty in determining what plaintiff would have earned but for the unlawful employment practice should be resolved against the discriminating employer. *See Brown v. Rollins, supra;* and *Johnson v. Goodyear Tire and Rubber Co.*, 491 F.2d 1364 (5th Cir. 1974).

### JUDGMENT

Based on the foregoing Findings of Fact and Conclusions of Law IT IS HEREBY ORDERED, ADJUDGED AND DECREED:

1. That the plaintiff be and hereby is awarded his costs in this action including reasonable attorneys' fees and expenses.

2. Counsel for the parties are directed to meet and confer within 15 days of the entry of this Order for the purpose of fixing or agreeing upon the amount to be awarded as back pay for the period between May, 1975 and October, 1978, after which plaintiff undisputedly earned an equivalent wage. Absent an agreement by the parties, plaintiff will notify the court within 20 days of the entry of this judgment and the court will, upon presentation of appropriate documentation, thereafter enter an order fixing the dollar amount of the back pay award.

3. Counsel for the parties are also directed to meet and confer within 15 days of the entry of this Judgment for the purpose of agreeing upon costs, attorneys fees and expenses. Absent such an agreement, (1) counsel for plaintiff is directed to file with the court a statement of time for which attorneys' fees are claimed and an itemization of costs and expenses; (2) the defendants are directed to file a statement with the court setting forth the basis on which they have compensated their counsel. The respective statements required herein shall be filed within 20 days of entry of this Judgment.