**Autry L. HATTON, Plaintiff,**

v.

**FORD MOTOR COMPANY, Defendant.**

**Civ. No. 77–71649.**

United States District Court,
E. D. Michigan, S. D.

Jan. 29, 1981.

Bruce Blumberg, Bell & Hudson, Detroit, Mich., for plaintiff.

Arnold Shulman, Dearborn, Mich., for defendant.

## MEMORANDUM OPINION

ANNA DIGGS TAYLOR, District Judge.

Plaintiff filed his complaint in this lawsuit, alleging race-based employment discrimination, on July 5, 1977. He had filed a complaint with the United States Equal Employment Opportunity Commission on October 28, 1976; and obtained a Right-to-Sue letter from that body on June 21, 1977. Thereafter, during August of 1977, he was discharged by the defendant "for the good of the company."

Plaintiff claims this court's jurisdiction pursuant to 42 U.S.C. § 2000e, et seq., Title VII of the Civil Rights Act of 1964; and 42 U.S.C. § 1981. This court finds its jurisdiction appropriate, under both statutes. The claim of plaintiff's complaint was that, during his employment by defendant since November 5, 1973, (which had not yet been terminated on the date the complaint was filed) he was treated disparately from and less favorably than similarly situated white employees in conditions of employment; in ratings by "Performance Reviews;" and in defendant's failure and refusal to promote him or accord him a merit salary increase during the entire period of his employment. Moreover, plaintiff claims that defendant retaliated against him in discriminatorily worsening his conditions of employment after he had filed a complaint with the Equal Employment Opportunity Commission.

Trial was held to the court, which struck plaintiff's demands for trial by jury and punitive and compensatory damages on the basis of *E.E.O.C. v. Detroit Edison*, 515 F.2d 301 (6th Cir. 1975). Trial was held for twelve days, commencing September 10, 1980. A prior trial before another court, sitting with a jury, had terminated in a mistrial in January of 1979. Plaintiff testified on his own behalf and following the court's denial of a motion to dismiss, made pursuant to Federal Rule of Civil Procedure 41(b), defendant presented fourteen witnesses.

■ This suit alleges that plaintiff was treated differently and less favorably, or disparately, by defendant, because he was

black. At the least, his claim is that race was a factor (and an impermissible factor) in defendant's less favorable treatment of him than of similarly situated white employees. Accordingly, his case is to be measured by the line of employment discrimination cases adjudicating "disparate treatment" claims, as opposed to those of "disparate impact."

In a claim of disparate treatment, a Title VII plaintiff must prove a prima facie case by a preponderance of all of the evidence (quite apart from the Rule 41(b) standard of a prima facie case), which "consists of facts sufficient to sustain the inference that the challenged action of the employer was motivated by impermissible considerations." *Mosby v. Webster College*, 563 F.2d 901 (8th Cir. 1977). The well-known four part test of *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973) may be applied. A prima facie case may also be made by "proof of actions taken by the employer from which we infer discriminatory animus because experience has proved that in the absence of any other explanation it is more likely than not that those acts were bottomed on impermissible considerations." *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978). The same standard is applicable to a plaintiff's case under 42 U.S.C. § 1981. See *Grano v. Department of Development of the City of Columbus*, 637 F.2d 1073 (6th Cir. 1980).

As the court stated in *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977):

"Disparate treatment" such as is alleged in the present case is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race, color, religion, sex or national origin. *Proof of discriminatory motive is critical*, although it can in some situations be inferred from the mere fact of differences in treatment.... Claims of disparate treatment may be distinguished

from claims that stress "disparate impact." The latter involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity. See *infra*, at 349 [97 S.Ct. at 1861]. Proof of discriminatory motive, we have held, is not required under a disparate impact theory. Compare, e.g. *Griggs v. Duke Power Co.*, 401 U.S. 424, 430–434 [91 S.Ct. 849, 853–854, 28 L.Ed.2d 158], with *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–806 [93 S.Ct. 1817, 1824–1826, 36 L.Ed.2d 668]. 431 U.S. at 335 n. 15, 97 S.Ct. at 1854 n. 15 (Emphasis added.)

When a court concludes that a Title VII (or 42 U.S.C. § 1981) plaintiff has proven a prima facie case of either disparate treatment or impact, then the court must consider the defendant's explanation or justification for the presumptively discriminatory action or practice. The type of defense that the defendant must then articulate depends upon the type of claim asserted by the plaintiff. In a disparate treatment case, the defendant must articulate "a legitimate nondiscriminatory reason" for his action. *McDonnell Douglas, supra*. In a disparate impact case, the defendant must present evidence that the challenged test, procedure, or requirement, bears "a manifest relation to the employment in question." *Dothard v. Rawlinson*, 433 U.S. 321, 329, 97 S.Ct. 2720, 2726, 53 L.Ed.2d 1786 (1977), quoting *Griggs, supra*; unless the procedure in question is encompassed within a statutory exception. See *Teamsters, supra*. In either case, the burden of going forward is then placed upon the defendant to articulate a nondiscriminatory rationale. Thereafter, the plaintiff may still prevail if he can, finally, establish by a preponderance of the evidence that the apparently nondiscriminatory rationale which was articulated by the defendant served only as a pretext for the in fact discriminatory acts or practices in question. See *Board of Trustees of Keene St. College v. Sweeney*, 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978).

■ This plaintiff has presented no disparate impact evidence, as such. He was the only black engineer employed by defendant at the Michigan Casting Center from 1973 to 1977. Accordingly, the court's examination of the facts of record is narrowed to the question of whether he was treated disparately and less favorably than similarly situated whites by defendant and its agents because of his race. Also, *Pettway v. American Cast Iron Pipe Co.*, 411 F.2d 998 (5th Cir. 1969), reh. den. 415 F.2d 1376 (1969), contains a full discussion of the proscription of 42 U.S.C. § 2000e–3(a) against discrimination against any employee who has opposed, made a charge of, or participated in an investigation of, any practice which is an unlawful employment practice under Title VII. Also see *Ayon v. Sampson*, 547 F.2d 446 (9th Cir., 1976). Again, in *Brown v. Rollins, Inc.*, 397 F.Supp. 571 (W.D.N.C., 1974) an employer was held liable under Title VII, where plaintiff was discharged in whole or in part because she had filed charges with Equal Employment Opportunity Commission. The *Brown* opinion refers us to *Pettway, supra; Barela v. United Nuclear Corp.*, 462 F.2d 149 (10th Cir., 1972), and *Smith v. Sol D. Adler Realty Co.*, 436 F.2d 344 (7th Cir., 1970), all for the proposition that race need not be the sole reason for a defendant's activity for it to be unlawful.

■ On the basis of the settled law outlined above, and the findings of fact set out below, this court finds that plaintiff has made a prima facie case on the preponderance of all of the evidence that defendant unlawfully discriminated against him on the basis of his race; that defendant has failed to articulate any legitimate nondiscriminatory reasons for its disparate treatment of plaintiff; and that such reasons as defendant has suggested for its conduct are in fact pretextual for unlawful race discrimination. The court further finds that the defendant unlawfully retaliated against plaintiff by worsening its discriminatory conduct toward him after the filing of a charge of discrimination and by finally discharging him one month after his filing of this lawsuit. All of the above constitute egregious violations of Title VII of the Civil Rights Act of 1964, and 42 U.S.C. § 1981.

Plaintiff was hired by defendant on November 5, 1973, after being interviewed by its agents at Ford World Headquarters. He had applied for employment in response to an advertisement for process engineers. Although he had no university degree, he had three years of college education and prior experience in California as a supervisory process engineer for a defense industry plant which had become defunct. Defendant assigned him to work at its new Michigan Casting Center facility (hereafter MCC) in Flat Rock, Michigan, as a salaried process engineer, Grade 6, at the rate of $1,100 per month. It was at this same salary that plaintiff departed MCC, in 1977. Supervisor of Salaried Personnel, Tony Burke, testified that the only occasion in those seven years on which he considered plaintiff's race was in his decision to hire plaintiff. Burke felt at the time that hiring plaintiff would improve the MCC Equal Opportunity report, inasmuch as all of the twenty seven process engineers then in the plant were white and he also anticipated that Mr. Hatton would "relate" well to the numerous hourly employees at MCC inasmuch as they, too, were black. Mr. Burke had been impressed by plaintiff's "intelligence", as well. When plaintiff was discharged in 1977, he was still the only black engineer at the facility.

Plaintiff was assigned to the Equipment and Process Engineering Department, which was managed by Mr. George Funtik, who was succeeded in June, 1974, by Mr. Don Penrod. Subordinate to Department Manager were Section Supervisors, and Unit Supervisors, who were the immediate superiors of the engineers. Each Unit Supervisor supervised from 4 to 6 engineers, and each Section Supervisor was responsible for approximately twelve. From his date of hire to November, 1975, plaintiff was assigned to the Melt Area of the Process Engineering Section, where his initial unit supervisor, briefly, was William Justusson. Justusson was promoted in January, 1974 and replaced by Todd Cleaver. Justusson

then served as plaintiff's and Cleaver's Section Supervisor. On November 14, 1975, plaintiff was transferred to the Finishing Area of the Process Engineering Section, where his unit supervisor was Gary Helgesen, until Helgesen was promoted in March, 1976 and replaced by Jack Bourassa. The Section Supervisor for some of this period was Conrad Perkey, until he was replaced due to Helgesen's promotion.

The duties of a process engineer in this facility were analysis and troubleshooting of the then on-going systems within the plant. The facility was a relatively new one, and something of a "white elephant", in that it was not yet functioning smoothly at the time of plaintiff's hire. Many of the employees, both line and supervisory, were new, some having had experience at other facilities of a similar nature. The process engineer's responsibility was to perform assignments within his area of expertise as given by supervisors, to inspect problems in various phases of the metal-casting process, to devise solutions to those problems, and to follow through on achieving the implementation of those solutions with fiscal and management personnel as necessary. Occasionally, process engineers would independently discover problem areas, beyond the scope of those assigned by supervisors, and initiate solutions. Such initiatives, if deemed to be cost-saving, were encouraged and rewarded by the defendant in the form of special suggestion awards. All of the work of process engineers required familiarity with the specific processes of the unit to which he was assigned, and cooperation and coordination with both hourly and salaried personnel throughout the plant, as well as with the outside contractors with whom MCC dealt.

The course of plaintiff's employment is marked by four different occasions on which his work was formally evaluated by supervisors. These Performance Reviews were drafted by an immediate supervisor, reviewed with others more superior, then shown to and discussed with plaintiff. These occurred in April, 1975; December, 1975; February, 1976; and July, 1977. Plaintiff was discharged in August, 1977.

These evaluations provide the court with salient reference points in the history of relevant events.

The first review was dated April 7, 1975, and signed by both Cleaver and Justusson. Early in May, the review was shown to the plaintiff and discussed with him in the presence of both Cleaver and Justusson. After this discussion, Penrod signed off on the review on May 12, 1975, indicating that he had read and approved its contents.

That first Performance Review was not made until plaintiff had been employed at MCC for seventeen full months. This was an extraordinary length of time at MCC, and it had passed without evaluation despite defendant's "Supervisor's Manual" guideline which states that reviews should be given once each year, preferably on an employee's service date; and further that new hires or transferees into a department are to be reviewed as soon as "an accurate evaluation of performance can be made", which is suggested as being within three to six months after hire.

No two of defendant's witnesses agreed on the reason for the delay of plaintiff's review, or whether any other engineer, despite numerous requests, waited seventeen months for a three month review (or even for a one year review). The court finds that the delay of the first review was the result of impermissible consideration of plaintiff's race, and was unlawfully disparate treatment.

When hired, plaintiff had been told to expect his first review within six months, and possible promotion thereafter. He inquired repeatedly of all levels of supervision and of the personnel department for a review, after the passage of the first six months. He was told by the personnel department that only his immediate supervisor could write a review; and by Cleaver and Justusson that personnel would do so. All concerned told him that no promotions are possible without a performance review.

When asked about the seventeen-month initial review period, Tony Burke (of Personnel) testified that an earlier review is

appropriate if any problems have occurred; and that reviews were made in timely fashion for "most" salaried personnel in those years, despite an occasional delay which it was his function to monitor. He did not know whether any other review was as untimely as was plaintiff's; and acknowledged that plaintiff had been to him at least twice to ask for a review and promotion. He, in turn, had spoken to Cleaver, whom he said asked him for more time, in order to give plaintiff "a fairer chance" in his first review.

Cleaver, on the other hand, testified that "nobody" got a timely review during that period, due to the pressure of work. He acknowledged, however, having received his own on time and that he knew of none as late as plaintiff's. Justusson testified that most reviews were delayed, because of the facility's numerous start-up problems. He could not recall, however, that any review was as late as plaintiff's, or what his response had been to plaintiff's admittedly several requests for a review and a raise; and could not recall whether plaintiff ever asked for a merit increase.

Mr. Justusson's testimony concerning the November, 1973 through May, 1975 period was that he saw "no problem whatsoever" with plaintiff's work, and that plaintiff showed great promise, at the inception of their relationship. Later, however, he heard from Cleaver that plaintiff had serious problems. The court finds that plaintiff's work during that period merited an excellent rating, by the definitions of plaintiff's own supervisors manual. He was given notably significant assignments, again by defendant's own definition. Four of the "Top Ten" projects published in January, 1975 listed plaintiff as the project engineer.

The May, 1975 Performance Review, however, presented several irregularities and inconsistencies on its face, aside from its untimeliness. Its evaluative language is of higher caliber than and inconsistent with the rating of "Satisfactory" which was given plaintiff. The court also notes the highly subjective personal criticisms and characteristic impressions on which defendant's

agents graded plaintiff. The supervisory latitude given, and the racial coloration of these particular supervisor's attitudes toward this employee, clearly culminate in an unlawfully subjective rating system, under *Rowe v. General Motors Corp.*, 457 F.2d 348 (5th Cir., 1972). No review of any other employee was presented into evidence; and no two of defendant's witnesses could agree as to either the ratings given other engineers, or as to what factors constitute an appropriate basis for evaluation in a performance review. The relevant portions of the Supervisor's Manual and the testimony, even when contradictory and conflicting reveal, however, that plaintiff was held to be a higher standard at all levels than were his fellow engineers.

In the "Evaluation of Performance" section of the first review, after a summary of plaintiff's typical job duties the review notes that he "carried out his assignments in a satisfactory manner," that he "follows his assignments through to completion," that his co-ordination of material tests was "thorough," that he "regularly exhibits good initiative," and that he "has developed a good knowledge of melting operations and is respected for it by those with whom he works." The same section states that plaintiff "must be cautioned on occasions to perform his assignments within the guidelines and direction of his department," and that he had frequently been "reminded to improve his rapport with both Company employees and vendors." The "Plans for Future Action" section of the review expresses the writer's expectation that future assignments would "provide a good opportunity to improve rapport" and that "emphasis" would be placed on getting plaintiff to abide by departmental guidelines and directions.

The Satisfactory rating given plaintiff by Cleaver, with Justusson's approval, was the lowest rating above *Un*satisfactory, which defendant's witnesses all agree requires discharge, and was the lowest rating given by Mr. Cleaver to any of the seven engineers under his supervision. In fact, both Tucker and Penrod could recall only one other engi-

neer to ever get a Satisfactory rating during their tenure at MCC. He was Hans Stermer, an engineer who was later fired. Neither Burke (of Personnel Department) nor Justusson could recall the rating of any other engineer than plaintiff. The court finds that testimony to be incredible.

The Supervisor's Manual, however, indicates that several of the traits ascribed to plaintiff in this review are the hallmarks of higher rating levels. The review states, for example, that plaintiff "regularly exhibits good initiative." The Manual states: "Excellent performance is marked by initiative and high quality and quantity of work." The review remarks that plaintiff "follows his assignments through to completion" and had been "thorough" in his coordination of numerous material tests; while the Supervisor's Manual advises that "Satisfactory Plus performance indicates thorough attention to and accomplishment of all assigned responsibilities ... initiative is regularly displayed." It is apparent to the court that the detailed description of plaintiff's work, in the respects quoted above, would have led to a Satisfactory Plus, or even to an Excellent rating, were it not for an unmentioned added consideration which experience leads us to conclude was the unlawful consideration of plaintiff's race.

The reference in the review to plaintiff's failure to operate within departmental guidelines, and his alleged lack of good "rapport" with co-workers and outside vendors are actually references to plaintiff's eagerness to accomplish his assigned tasks quickly and efficiently. Cleaver testified that plaintiff often would handle his own paperwork on project-request forms, bypassing the clerical personnel whose job it was to walk such papers through the appropriate supervisory signatories and purchasing department. Plaintiff's doing this phase of the job himself, Cleaver acknowledged, was indicative of plaintiff's diligence in meeting Cleaver's deadlines. Justusson testified that Mr. Enright, a maintenance manager in the facility, had complained to him that plaintiff was in the habit of approaching Enright directly with his assigned proposals, instead of sending them "through channels:" this was a habit which apparently disturbed Enright greatly and he directed Justusson to only permit plaintiff to approach him through channels in the future.

Similarly, the details which were offered in testimony explaining the "rapport" problem, reveal defendant's displeasure with plaintiff's custom of pressuring outside vendors to fully meet the exact specifications of defendant's contracts and to meet them in a timely fashion. Justusson testified that Union Carbide had complained of plaintiff's "rapport" problem. However, Justusson himself had sent plaintiff to them to complain of their shoddy service and to resolve their failures to meet commitments. Such efforts might well be lauded, and received as a sign of dedication, rather than listed in a performance review as negative aspects of plaintiff's work and/or personality. But the pattern of treatment in plaintiff's case was never to give him the benefit of any doubt, and to describe his conduct, wherever remotely possible, in a negative light. Mr. Cleaver testified that pressure on engineering personnel (and the passing-on of that pressure to co-workers and outside vendors) was part of the job, and that from time to time, engineers would often "rub someone the wrong way." The reaction to such irritation would vary, Cleaver testified, depending on its frequency. However, despite the testimony that actual complaints were few (Enright, Boyer and Union Carbide) and subject to praiseworthy explanations, the incidents were promptly chalked up to plaintiff's "rapport problems", rather than to diligence and devotion to his employer's best interest. Indeed, Cleaver testified that plaintiff needed to learn to fit better into the priorities of others. Among the "others" he included two named vendors to Ford Motor Company.

Neither does it impress the court as either fair or evenhanded that such behavior, even if unwanted, would reduce a rating of plaintiff's work which otherwise justified at least a Satisfactory Plus rating, to a Satisfactory rating: and the undisputedly lowest

rating to be given by Cleaver to any engineer. The only explanation for the discrepencies between the Manual guidelines, defendant's agents' testimony, and the rating, is that defendant, (through plaintiff's immediate supervisor Todd Cleaver) was determined not to give credit where credit was due to the sole black employee among an otherwise all-white engineering staff. Cleaver testified that, despite the applicability of the Manual's higher rating definitions to plaintiff's work, which is obvious to any fair reader of the Manual and to this court, he never considered the possibility that Hatton's work might fit into any higher definition than the minimal "Satisfactory" rating.

After discussion of the review with his supervisors, and complaints about its inaccuracies to higher-ranking personnel, plaintiff submitted a formal letter of rebuttal to the review, which is dated May 5, 1975, and which was placed in plaintiff's personnel file.

Although the rebuttal letter was read by both Messrs. Cleaver and Penrod, and passed on to Burke, its contents were never investigated or discussed personally and directly by any of those gentlemen with plaintiff. Instead, each of defendants' agents in turn chose to forego any investigation of the plaintiff's complaints and merely accepted Cleaver's blanket denial of his allegations, being convinced by this denial, and apparently predisposed to believe, that nothing was amiss. Plaintiff thereafter spoke with a Mr. Proctor, a black administrator of the Ford Industrial Relations Division. Proctor suggested that one of his staff, Mr. Jim Brainard, meet with plaintiff. This conference was arranged, and its outcome was that plaintiff's papers were to be "distributed;" meaning that his qualifications would be circulated throughout the division for consideration for any openings which might occur elsewhere. Additionally, MCC Personnel director Tucker advised personnel officer Burke to transfer plaintiff away from the supervision of Cleaver as soon as possible, and arranged an interview between plaintiff and Tilman Dozier, whose position was Personnel Manager-Minorities of Ford Motor Company. This flurry of activity belies testimony of line supervision to this court that the rating was unquestionably justified, and that no considerations of race entered into any of their actions with plaintiff.

In essence, plaintiff's rebuttal letter listed much of the work he had done in the year and one half preceding the review; the work he was most proud of, and which he felt demonstrated the inaccuracy of the Satisfactory rating. The letter also asserted that Cleaver's unrelenting harassment of plaintiff had tainted the reliability of the rating.

Specifically, the letter related (as did plaintiff in his testimony) the belittling manner in which Cleaver openly criticized plaintiff and his work, and Cleaver's failure to behave in a discrete or professional manner towards plaintiff. No other engineers were so treated. This is the accusation which neither Messrs. Cleaver, Justusson nor Penrod found worthy of direct response, although Cleaver was as new to his supervisory role, at the time, as plaintiff was new to the facility. Tucker thought the matter important enough to refer to Division Industrial Relations personnel.

The list of accomplishments provided by plaintiff in his letter was substantial, and none of them were mentioned in the review. The question over whether it is the usual practice to list specific successful and/or failed projects on Performance Reviews has not been clearly resolved, and is discussed *infra*, with regard to later reviews. It suffices to say that on this question, as on many, defendant's own witnesses conflicted and were frequently self-conflicting: and no evidence other than their testimony was presented.

First, plaintiff listed his electrode conversion project. The casting center operated eleven large furnaces, six for melting and five for holding molten metal. Those furnaces initially utilized 18″ electrodes. During 1974–75, a project was undertaken to convert the electrodes used, from the 18″ variety to 20″ variety. The conversion was

an important cost-saver to defendant and the project, according to all witnesses and according to plaintiff's exhibits, which listed plaintiff as the assigned project engineer at all stages. It was a great success. The defendant vigorously denies, however, that the conversion project was plaintiff's original "idea", and furnished the court with abundant testimony (albeit all conflicting) and several exhibits in support of its position that the "idea" of conversion (which had not previously been acted-upon) predated plaintiff's hire by between one and four years. Penrod credited the idea to the plant architect in 1969. Cleaver testified that Tom Bartos thought of it in 1973; and Povick "heard talk" of it in 1971.

The court notes that the documentation provided this court by defendant, one of the largest corporations in this nation, is far from comprehensive on this or any subject treated by this lawsuit: and also notes that each of defendant's witnesses differed substantially in their testimony as to the original persons responsible for and the developmental history of the conversion project. The conflict in testimony can, in part, be explained by the varying positions of the witnesses, and hence their different levels of acquaintance with the detailed operations of the facility. But the absence of conclusive exhibits cannot be explained at all. Neither does the defendant's insistent dwelling on the concept of "authorship" of the idea make sense, since the crucial fact of plaintiff's stewardship over virtually all phases of the successfully-implemented project, cannot be and has not been denied. It was a successful project: it was his project: and it was not mentioned on the review. Undisputedly, 18" electrodes were not used prior to the formal project request of plaintiff for a conversion which he submitted in May of 1974, which was approved by supervisory personnel, endorsed by management, and begun in October of 1974 (with the "Project Detail" form bearing plaintiff's name), and which is in evidence in this lawsuit. Subsequent references to the on-going project (which was listed twice in defendant's "Top Ten") also note plaintiff's assignment as the chief project engineer in charge of all purchasing, installation and implementation.

The actual decision to convert and the implementation of the idea were undeniably under plaintiff's guiding hand, and he undisputedly demonstrated a high degree of engineering capability in his assignment to this cost-saving project. The absence of any reference in his Review to his work on this project is highly suspect, and taken together with other omissions, and evidence of racial animus in separate incidents, is evidence of an unlawfully discriminatory evaluation. The court finds all of the contradictory explanations given to be incredible and pretextual for defendant's failure to credit plaintiff with this major cost-saving project. Also pretextual and incredible were Cleaver's explanations that this was not "typical" of plaintiff's work, and that most of the costs saved were actually caused by a drop in copper prices.

Another achievement omitted from the first review was plaintiff's implementation of an electrode storage area, located outside of the physical plant. Prior to plaintiff's hire, two concrete platforms had been constructed. Plaintiff was assigned the responsibility of overseeing the construction of a third platform, and the utilization of all three for storage of electrodes (rather than storage of metal castings, which had been their former use). This phase of the project was successfully completed, despite Penrod's having given it low priority and assigning those tradesmen under his supervision elsewhere, so that the construction crews necessary for concrete-pouring were not available to plaintiff. The only mention of this project was at the second review given plaintiff, in December of 1975, which emphasized the occurrence of "delays." In that review, the responsibility for the delay in completion of the project was totally laid at plaintiff's door, and no reference to the unavailability of Penrod's construction crew was made. Plaintiff was blamed, therefore, not only for the "rapport" damage of pressing Penrod, but for the *delay* caused by Penrod's downgrading of his project.

Plaintiff's rebuttal to his first review also objected to supervision's failure to recognize and credit his proposal that regular, rather than premium-grade electrodes be utilized in the holding furnaces. In May of 1974, plaintiff had submitted the program, as evidenced not only by his testimony but by his letter to Justusson, with Cleaver's approval. The expectation and actual result of the suggestion was a substantial savings to Ford Motor Company. Cleaver rejected plaintiff's proposal at first, and could not recall its having been made when he testified. Justusson also encountered the same failing of memory, until shown plaintiff's exhibits. Both witnesses testified that the program was ultimately dropped because of subsequently increased breakage which exceeded the cost savings. Nevertheless, the proposal was accepted and implemented, if only temporarily, and yet was not considered for inclusion in the Performance Review as typical of plaintiff's work.

Lastly, plaintiff's letter complained of the first review's omission of any mention of an "electrode trimming" suggestion which enabled MCC to trim down partly damaged electrodes, to be recycled for use at the defendant's Cleveland Casting Center. This plan was also implemented, and resulted in savings. It is not mentioned in the first review, and contrary to the testimony of defendant's witnesses, was never mentioned in subsequent reviews, either. This omission occurred despite the fact that Penrod wrote plaintiff a letter of commendation in June of 1974 for the suggestion, and plaintiff received a $1,500 cash award for it as well. Cleaver testified that he was aware of the plaintiff's idea, and the receipt of the award. He had concluded, however, that the other emoluments had rendered any mention of the effort in a Performance Review superfluous. Justusson could not recall either the program or whether it was plaintiff's; Burke recalled nothing on the subject at all.

The court finds, therefore, that the plaintiff's first review was not given as timely as was defendant's custom with white process engineers; that it neither portrayed his accomplishments accurately, fairly described alleged deficiencies in his performance; nor objectively rated him in accordance with defendant's own rating scale. The net result was a Performance Review lower and later than similarly situated whites.

The pretextual nature of defendant's criticisms, and the race-based reasons for their failure to credit his achievements, are clarified through two incidents which occurred prior to the issuance of the first performance review.

During the early winter of 1975, while attending an engineering seminar at a suburban hotel, plaintiff was observed by Justusson while conversing with a white woman. The following day, Justusson warned plaintiff not to be seen in public with white women. Although Justusson in his testimony flatly denied the comments, he vividly remembered the occasion of the seminar, and having seen the plaintiff with the white woman in the bar of the hotel in question. The clarity of this memory stands in stark contrast to the balance of Justusson's rather unforthcoming testimony, and the court concludes that his ability to so vividly recall this incident among the many others relevant to this case five years later, is evidence that something more took place than he acknowledges. The court finds plaintiff's version more credible. This was a most blatant example of defendant's agents' discomfort and hostility toward their first black engineer at the plant. Justusson, it must again be noted, was plaintiff's supervisor.

The second incident is an even more powerful indication of the racist work environment to which plaintiff was subjected, and it took place in February of 1975.

In that month, during office hours, a paper bearing the reproduced logo of the City of Detroit and entitled "Police Sergeant Examination (Blacks Only)" was placed on plaintiff's desk by persons unknown. It was discovered by plaintiff on his return to his desk. The mock "examination" consists of a vicious parody on the supposed qualifications or lack thereof of

black applicants for civil service jobs, mimicking the black vernacular, implying that all black people are named "Willie", etc., as well as exceedingly stupid, lazy and criminal: and that natural black association with crime, welfare, alcoholism, and laziness are "qualifications" for "affirmative action" promotional consideration.

Plaintiff's reaction to the paper was immediate indignation, but his outrage was met by laughter from those of his colleagues who were gathered when plaintiff found and read the document. Plaintiff testified that supervisor Cleaver was one of those present and laughing at that time, and that Cleaver failed to reprimand anyone for the production of the document, but instead stood by while it was suggested to plaintiff that he "change his name to Smith or Jones" so that he too, could apply for and take the "examination." Although Cleaver's version of the incident is that he was not present when plaintiff saw the exam, he readily acknowledged that he had seen it, and that when he first read it (after being shown it by Tom Bartos, another engineer), he probably laughed, because (it was his testimony) he found it amusing. Once again, the court finds plaintiff's version more credible. However, even if Cleaver's were correct, it is clear that he took absolutely no action to discover or reprimand the perpetrator of the racist "joke" on plaintiff, and that he implicitly endorsed and ratified the circulation of a racist libel among his staff. There can be no clearer evidence of racial animus than Cleaver's testimony as to his amusement by this document; or than his failure to take any action to assuage the misery which it visited upon the plaintiff.

Plaintiff's second review occurred seven months later, in December of 1975; and again he was rated only as Satisfactory. The review followed plaintiff's involuntary transfer to the Casting/Finishing Unit, effective on November 14, 1975.

During the period between the first and second review, plaintiff's unhappiness had continued. He testified that he continued to be harassed by Mr. Cleaver, and a dispute developed about overtime assignments. Plaintiff was an "exempt" salaried employee, meaning that if and when work on a given project required him to stay late on a weekday, no overtime would be paid. A few hours' work of this type was expected of dedicated employees. But work on weekends was compensated at a premium by defendant, or compensatory time off was given. During October of 1975, plaintiff expressed his desire to keep his weekday evenings free, in order to attend night school, and this request was recorded in a memo from Cleaver to Burke, endorsed by Justusson and Penrod. From that point forward, however, plaintiff was not assigned *any* overtime work.

Defendant's witnesses offered three different and totally contradictory rationales on this topic. Cleaver simply stated that plaintiff had requested to be relieved of all overtime assignments. This misinterpretation of plaintiff's request is not borne out by Cleaver's own memo, which plaintiff has placed in evidence. Justusson stated that he was unaware that plaintiff had ever been taken off the overtime lists. Penrod's opinion was that plaintiff was denied overtime pursuant to a plant-wide budget cutting program in which all overtime was decreased. The court finds that defendant has submitted no credible evidence of a program to cut overtime, and that plaintiff alone suffered this cutback in extra pay, individually, against his will, without any satisfactory explanation, then or now. It was racially disparate treatment in plaintiff's terms and conditions of employment, and based upon previously demonstrated racial animus.

Plaintiff objected to his transfer to the Casting and Finishing Unit, inasmuch as the skills required in that unit were primarily those of mechanical engineering, and not within his expertise. The transfer, however, was defendant's solution to the on-going friction between plaintiff and Cleaver which had kept the entire Melt Unit "in turmoil", according to the testimony of defendant's witnesses. Rather than even superficially investigate the possibility that

Cleaver's hostility toward plaintiff, or his lack of experience in his first supervisory position might be a source of the turmoil, defendant's agents, without giving any attention whatsoever to Cleaver's role, transferred plaintiff to a unit which was inappropriate to his area of expertise.

At the time of the transfer, personnel officer Burke instructed Helgesen, plaintiff's new supervisor, to prepare a performance review within ninety days. This instruction further corroborates plaintiff's evidence that the normal procedure is prompt evaluation of newly hired or transferred employees. The court again notes, in this regard, the extreme tardiness of plaintiff's first review.

Despite Burke's instruction to Helgesen, however, it was plaintiff's former supervisors, Cleaver and Justusson, the focal points of his prior problems, who authored the December, 1975 review. Defendant's witnesses explained that since the "usual" procedure was for an early review following a transfer, and plaintiff had specifically requested a prompt one, the review was given by the former supervisors, within one month of the transfer. This explanation is a total nonsequitur, particularly in view of defendant's acknowledgement that the transfer was intended to remove the tensions between plaintiff and Cleaver. It is indeed ironic, that the defendant's purported solicitude toward plaintiff in this one instance resulted in yet another evaluation by the persons who had overtly demonstrated the racial prejudice which they held against him. Clearly, plaintiff's removal from his initial unit was for the single purpose of sparing *Cleaver*, alone, from the further aggravation of plaintiff's black presence.

Once again, plaintiff received the lowest rating of any of the five which Cleaver wrote at the time. The review belatedly noted plaintiff's participation in the electrode conversion project, but only in the form of a terse observation that plaintiff's "coordinating" responsibilities had been "performed in a satisfactory manner." While noting the delay in the completion of the construction of the electrode storage/handling facility (placing all of the blame for the delay squarely on plaintiff's shoulders), the remainder of the review credits plaintiff with "thorough" work, and the initiation of significant steps toward improving metal delivery within the facility. Yet it rates him only as Satisfactory.

Plaintiff filed another letter of rebuttal, and complained to line supervision and to the personnel department. The only defense of the Review on this record was offered by Penrod, and relied in large part, once again, on the criticism that plaintiff had on occasion made "end runs", and bypassed established intra-company procedures. The possibility that such behavior could be considered an asset in the systemic flux of this fledgling facility was again ignored. It also may well refer to his complaints against his supervisors. Again, the review noted that plaintiff should "concentrate on improving his rapport and compatability with fellow employees and supervisors." Also, in June of 1975 plaintiff had been written a second letter of commendation by Penrod; whose testimony was that such an event was not a proper consideration for a higher performance review rating.

Plaintiff's third Performance Review was given him two months after the second, in February of 1976, by his new supervisor, Gary Helgesen, the section supervisor of Process Engineers. It was a rating of Satisfactory-Plus. Helgesen testified that he never had any problem working with plaintiff; and wrote in the review that plaintiff "adapted himself rapidly to the change in job responsibilities . . . willingly pursued his new job assignments with interest and ambition . . . receives instructions and criticisms well and has made good progress on his job assignments with a minimum of assistance from his supervisor." Similarly, Unit Supervisor Perkey's evaluation of plaintiff at the time (which was done in his role as Helgesen's supervisor) and confirmed in his testimony, was that plaintiff was a fine engineer, a situation which never changed. Perkey testified "I consider him

a very competent engineer. I want to get that straight." Perkey testified that only plaintiff's attendance record as later reported by Jack Bourassa became unacceptable (an allegation which is discussed infra). The court attributes the vast difference between the earlier Reviews and this one both in timeliness and in substance, to the change in supervision. It substantiates plaintiff's contention that, but for Cleaver's hostility towards him as a black person, his ratings in the past would have been greater than Satisfactory.

Immediately after the third review, Helgesen was promoted and Jack Bourassa became plaintiff's immediate supervisor.

The court notes here that plaintiff's complaints about his first two performance reviews, his failure to be considered for promotion, and his conditions of employment, had gained him an appointment during 1975 with Tillman Dozier, a Personnel Manager of minority employment and self-described minority ombudsman at Ford from 1975 to 1977. In his role as an ombudsman, however, Mr. Dozier was of negative value to plaintiff.

Mr. Dozier, according to his own testimony, first and foremost made one thing clear to plaintiff during the interview: his lack of authority to effectuate a transfer, a promotion, or virtually any other personnel action: and his limited ability to listen and respond to employee complaints. Dozier, a black man, made it clear that he could not comment on the validity of the plaintiff's past reviews; but he firmly suggested nevertheless that plaintiff sign them, and inquire of his supervisors as to what improvements were expected of him. Mr. Dozier advised plaintiff that his brief tenure with the company and his merely Satisfactory ratings made any recommendation for promotion or transfer unlikely, as did plaintiff's lack of a master's degree in engineering. The court notes, however, that Jack Bourassa, plaintiff's supervisor from March, 1976 until plaintiff's termination in August, 1977 was not possessed of any degree, engineering or otherwise, undergraduate or graduate.

Dozier, moreover, testified that he personally had never experienced racial discrimination in his lifetime, and credited his long list of accomplishments and promotions to equality of treatment at Ford (and prior thereto, commencing with the newspaper publication of his picture, as a high school student, with the then-Governor of Michigan) on the sole basis of his qualifications. If and when any black employee came to him with the complaint of race-based employment discrimination, Dozier testified that he felt it incumbent upon himself to "set the record straight immediately." He did so with plaintiff, on this occasion.

Dozier's conclusions about plaintiff were that he was not "enamored" of him, and doubted that plaintiff was treated unfairly. Dozier informed the court that he himself had never used race as an excuse, and had been thoroughly satisfied by his sixteen years of employment with defendant during which he had received numerous promotions *although he had never worked under the supervision of one black or one woman.* Dozier made no other specific recommendations to plaintiff, and did not advise him that the Equal Employment Opportunity office of defendant, which received and investigated complaints of racial discrimination within the company, was located right across the hall from the office in which they talked.

Plaintiff's work in the Casting/Finishing Unit continued. He received another letter of commendation from defendant's Suggestion Administrator on May 28, 1976. In July of 1976, however, plaintiff suffered a stroke, which forced his absence from work until November of 1976. During his period of convalescence, plaintiff filed his complaint with the Equal Employment Opportunity Commission, which is dated October 8, 1976.

After his return to work, plaintiff did not receive another performance review until July of 1977, when he received his fourth and last. It was *seventeen months* after his third and by its terms covered only the period from March, 1977 until July of 1977

(the last five months of the seventeen); no explanation has ever been offered for defendant's failure to evaluate plaintiff's work during the period from February, 1976, through March of 1977. Bourassa testified that he never attempted to evaluate that year of plaintiff's performance.

The rating given to plaintiff in this review was Unsatisfactory, and it was followed by plaintiff's termination from employment. In fact, however, there is no evidence in the record of any decline in plaintiff's earnest commitment to maintain his initial high standard of performance, even in the face of demeaning "make-work" assignments, and continued and increasing hostility from his supervision.

The review, written by Jack Bourassa, states that plaintiff's "interest" in his work had waned from the outset of his assignment to the Casting/Finishing Unit. Next, the review states that plaintiff's "erratic attendance" resulted in failure to complete assignments. The review concludes that "it is not anticipated that necessary performance improvements will be achieved", and predicts no change in plaintiff's "low job interest and negative attitude." Additionally, the review lists and explains three "typical uncompleted assignments" of plaintiff. It mentions no completed tasks whatsoever, although a number of such were acknowledged by defendant's witnesses at trial.

It is the court's finding that any negative attitude on plaintiff's part during this period developed; if at all, only as an expressed reaction to his unhappiness with the transfer to a mechanical engineering job, and to the growing adverse treatment he received, despite his serious illness and subsequent handicaps, at the hands of Mr. Bourassa. Plaintiff's reaction was that of a proud and beleaguered employee, whose engineering skills continued to be of high caliber, available to a defendant whose agents rejected, demeaned, and ridiculed him with impunity.

Plaintiff testified that after the filing of the EEOC complaint and his illness, Bourassa began a practice of giving him assignments by means of handwritten notes which were dropped off on his desk, contrary to the usual practice of giving assignments orally, which was continued with the other engineers under Bourassa's supervision. The personal rejection implicit in this method of giving assignments was echoed in the nature of the assignments themselves. They were frequently repetitious, "dead-end" projects, sometimes consisting of mere back-tracking over others' work, and rechecking previously completed projects.

Nevertheless, plaintiff did successfully complete a number of projects, which are not mentioned in the fourth review. Many were completed during the thirteen month period which has been ignored by defendant altogether. They included correction of temperature fluctuations on the small parts heat-treat furnaces, completion of a quality control project (known as the Green Scrap Project), and investigation at other facilities of the feasibility of the use of computers to record down-time in the Casting/Finishing Area.

The fourth review not only omits mention of plaintiff's successful projects, but specifically lists three "typical" uncompleted assignments. This listing was made despite testimony by defendant's witnesses that it is not considered appropriate to list individual assignments on performance review. That testimony was offered in explanation of the absence of any enumeration of *successful* projects on plaintiff's first and second reviews. Justusson testified that he would not write specific lists of assignments on reviews, and Helgesen agreed generally with that viewpoint. Mr. Burke, however, contradicted their testimony.

It appears that the practice in Review styles at defendant's facility was not clearly reduced to writing, and remained so vague as to permit the manipulation of plaintiff's reviews to suit the prejudices of each supervisor. The manipulation succeeded in reflecting details of plaintiff's work *only* when such details were negative, and hence reinforced a discriminatory low rating of his work.

At all events, plaintiff offers an acceptable explanation for one of the "typical" incompleted assignments listed in the fourth review: the Gear Case Casting finishing process sheets. Plaintiff's uncontradicted testimony was that his instructions were to submit his sheets to a senior engineer, Jim Austin, for approval, and that Austin's failure to pass them on to supervision accounted for the project not being finished. Defendant's own witnesses concurred in that fact.

Plaintiff's attendance problems allegedly constituted the heart of the reason for the negative fourth review, and were the justification offered by defendant for plaintiff's ultimate termination.

When plaintiff returned from his medical absence due to the stroke (and not, incidentally, after having filed his EEOC complaint against the defendant) his supervisor, Bourassa, began to gather a private and extraordinarily detailed compilation of negative information regarding plaintiff. These papers were kept in a looseleaf binder in Bourassa's desk, and were submitted to the court as evidence of plaintiff's wrongdoings, his daily attendance, and his noted activities. Each departmental secretary at MCC maintained an official record of all engineers' attendance; other regular business records were kept in personnel files, *and* an official Ford Motor Company time card system was utilized for the entire staff. None of those business entries, however, were offered to substantiate plaintiff's discharge. Instead, the secret notebook of Jack Bourassa was produced. Bourassa testified that he was instructed after plaintiff's medical leave to keep a separate record on plaintiff; an action which he had never taken before, and has never taken since. The record consisted of both handwritten and typewritten notes, from, to and about plaintiff, company forms filled out by plaintiff and others, a calendar which Bourassa compiled, and other unofficial writings relating to the period from July, 1976 (the stroke) through plaintiff's discharge.

The origin of the decision to keep this special record is unclear. Mr. Bourassa testified that someone from Industrial Relations instructed him to keep it, since plaintiff had possibly overextended his available medical leave for the year 1976 (an allegation which is not verified by any official records in evidence, and which Bourassa himself later contradicted). At another point in his testimony, Mr. Bourassa indicated that the reason for the record-keeping was the potential of civil rights litigation by plaintiff. Helgesen testified that he told Bourassa to keep the record, an instruction for which both Perkey and Tucker also claimed responsibility, the latter for the reason that discipline was being contemplated. At any rate, the determination was made immediately after plaintiff's major illness, and after the filing of his EEOC complaint.

This unusual practice of the "secret notebook," whatever its stated purpose and whoever its originator, was applied uniquely to the plaintiff. In the entire matter, absolutely no consideration was given to the fact that the alleged decline in attendance was due to plaintiff's stroke, convalescence, and continuing need for medical attention. The testimony was uncontroverted that the absences of which defendant complained were necessitated almost solely by various doctors' appointments and hospital visits. Moreover, there is no evidence that plaintiff *ever* exhausted his medical leave. Indeed, it is undisputed that, when plaintiff returned in November, 1976 from his long illness (and EEOC filing) he was required to take all remaining 1976 vacation time immediately, beginning on November 15th rather than to wait (with all other engineers) for the annual Christmas season plant shutdown.

Rather than recognizing plaintiff's obvious medical difficulties and the fact that he was still utilizing sick time accrued for precisely such an eventuality, defendant's agents grasped the situation of his illness as a weapon to be utilized against plaintiff, and as an excuse for his ultimate release from employment. The defendant's preparation of a pretextual defense to his charge

of discrimination was thus manufactured in advance of litigation, and was indeed earnestly presented to the court as justification for all actions taken. None of defendant's regular business records in this entire sorry matter were offered into evidence by defendant itself.

The pretextual aspect of the absenteeism discharge is clear: defendant's witnesses testified without variation that absenteeism was not normally mentioned in performance reviews, that employees with medical problems were not routinely fired; that the quality of plaintiff's engineering work never declined; and that he did not exhaust his leave. In fact, although plaintiff's absences from the time of his return to work in November of 1976 to the time of his discharge were higher than those of other employees, they were comparable to those of others. During that period of time, plaintiff took 55 ½ sick days, while engineer Callaghan took 39 days off for the same reason, Milligan 22 days, Hartner and Pilkinton 19 apiece. There is no evidence that any of these employees were the subject of any personnel action whatsoever for their attendance or that special notebooks were begun on their habits; and the evidence is clear that plaintiff's rating in his fourth review was again lower than of any other engineer.

Neither is there any dispute that plaintiff was not warned of the effect that poor attendance might have on his performance review, or on his future employment prospects. The record in the case includes no reprimands of any kind concerning absenteeism. Defendant's witnesses each said that out of special consideration for plaintiff, and to give him a "break", he was not warned of excess absences.

Prior to the issuance of plaintiff's fourth review, two incidents took place in the facility upon which plaintiff relies as further evidence of discriminatory treatment. Although the court rejects the life-threatening interpretation that plaintiff has given to these events, the court does find that they constitute additional evidence of unlawful retaliation against him by defendant's agents for his filing of the EEOC complaint, and eventually for his filing of this lawsuit in July of 1977.

In January of 1977, plaintiff was instructed to consult with another engineer, Jim Miller, for orientation to the engineering of the IsoCure process of MCC, and he did so. This was a chemical process designed to make "cores" for use in the furnaces. The "cores" were made of sand, which was bound together either by heat treatment or by the use of chemicals. The latter was the IsoCure process. Although it was customary to assign an engineer to monitor the process at the level of professional engineering, and Mr. Miller had been the engineer prior to his transfer, plaintiff was assigned by Bourassa after Miller's orientation, merely to clean and calibrate the machine. That function had been routinely assigned, on all prior occasions, to machinists and not to any other engineer. Bourassa acknowledged that no other process engineer than plaintiff was ever asked to perform this function. He testified that plaintiff was given the assignment because he was the "most competent engineer."

Plaintiff was not only disparately demeaned by this assignment, but he suffered a severe and well-documented adverse physical reaction to the chemicals, which required immediate and prolonged treatments at the University of Michigan Hospital. Bourassa and other supervision at the facility knew prior to this assignment that exposure to those chemicals posed, at the least, the risk of serious dermatitis. They knew this because the machinists had refused to perform the work again after sustaining that reaction, and had a grievance pending when plaintiff was sent to perform the task. Plaintiff's suffering was more severe, in the nature of burns to his throat and face. His injuries are clearly demonstrated on the record and their cause is not disputed. Plaintiff's complaints about his injuries, his refusal to return to the assignment (on doctor's orders) and his continuing need for medical attention, were met with further harassment by defendant's agents. Plaintiff was chastised, accused of insubor-

dination for refusing to return to the assignment, questioned suspiciously about each subsequent medical appointment and often refused permission to see his doctor; without any attempt by defendant to clarify his medical status. Finally, the treatments required because of the IsoCure injury became an additional reason to discharge plaintiff for absenteeism.

Bourassa continued building his unique record book on plaintiff's activities, gathering ammunition for the unsatisfactory review and discharge which were to follow. The timing of this IsoCure incident cannot be ignored, occurring as it did only three months after the filing of the EEOC complaint, and two months after plaintiff's initial return to work following his stroke.

In May of 1977, plaintiff was involved in an accidental collision with a forklift truck in the facility, while he was a pedestrian. There can be no argument with the fact that the incident occurred, although the court cannot adopt plaintiff's theory that it was an attempt to maim him. It was defendant's treatment of plaintiff afterward, however, which this court again finds particularly egregious. During that period, plaintiff was recuperating from a leg injury and walking only with the aid of crutches; he was still suffering from IsoCure chemical burns to the face and throat; and was handicapped by a stroke.

Bourassa's assignment of plaintiff at this time to stand and count cores along a conveyor belt; his initial refusal to permit plaintiff to get immediate medical attention to his leg after the incident, and his requirements that plaintiff walk back and forth across the facility to seek various approvals, (new requirements for medical attention which were created ad hoc for plaintiff's situation) are all part of the pattern of defendant's discriminatory retaliatory harassment of plaintiff, which is highly apparent during the post-EEOC period of his employment. When plaintiff again required hospitalization in June of 1977, due to the stroke and/or the leg injury, he was again penalized in Bourassa's secret record book, for excessive absenteeism. When he requested time for documented requisite attention to his throat burns in August, he was discharged.

The history of plaintiff's treatment by his supervisors, their inaccurate and clearly biased performance reviews, and their inappropriate job assignments are not the only indicia of invidious discrimination. During the four years that plaintiff was employed by defendant, he never received one promotion or pay increase. Defendant claims (but has submitted no evidence) that plaintiff did receive those "general" increases which were given to all employees, factory-wide, a fact which plaintiff denies. Even if the court accepts defendant's allegation that plaintiff received all general increases, a clearly discriminatory failure to promote or award merit increases is apparent.

Long before receipt of his untimely first review, plaintiff spoke to his supervisor about a merit increase and of promotions. The explanations given to him by Cleaver and others constituted no more than an avoidance of the issue, and never clarified plaintiff's circumstances. While being shuttled back and forth between various supervisors and personnel department employees, plaintiff was told that the time had not yet arrived for a raise, that there was a "freeze", and that he did not satisfy varying discrete criteria applied to determine raises. After all was said and done, plaintiff entered his employment with defendant as a Grade 6, being paid $1,100 per month, and departed at the same rate four years later. That fact compels the conclusion that he did not even receive defendant's general increases.

The defendant's witnesses claimed that a "freeze" on merit increases precluded giving one to plaintiff. Justusson testified that the "freeze" was in effect from 1973 until 1976; while Burke testified that it lasted from late 1974 through 1975. The testimony of each of those gentlemen was contradicted, however, by the promotion and salary increase data which defendant furnished plaintiff during discovery and which is now in evidence. Therefore, as in all matters of significance to which defend-

ant's agents testified herein, the court is unable to credit their testimony. Defendant furnished plaintiff with a list of "Promotions of Process Engineers, 1975–1977." Of the 28 process engineers, it is undisputed that all were white but plaintiff. During the alleged 1975–77 "freeze," fifteen promotions were made among thirteen engineers, and none is listed for plaintiff. Another of defendant's lists is entitled "Raises of MCC Process Engineers", and purports to include merit and general increases, 1973 to 1976. Twenty of the 28 engineers are listed for some sort of increase. Ten merit increases are listed, among a total of fifty-six. None is listed for plaintiff. During the year of 1975, which Burke said was subject to a freeze, there were 3 promotions and eleven increases. Moreover, plaintiff was not given an increase after the "freeze" was lifted, by any theory, in 1976. That was the year in which he had the Satisfactory-Plus rating which Cleaver had testified his other supervisees had earned, and on the presumable basis of which several among them found their way onto the promotional lists. Burke testified that no supervisor ever recommended plaintiff for a promotion; and that he was, accordingly, never considered for one despite his numerous requests, his suggestion awards, his letters of commendation, and his rating.

At the time of plaintiff's discharge for "minimal" attendance, consequent unsatisfactory performance, and "the good of the company," the Industrial Relations Director of MCC testified that plaintiff had never once been reprimanded for his attendance, as a "special accomodation" to him.

As in most matters, defendant offered no course-of-business documentation on the terms of plaintiff's discharge. Plaintiff testified, however, and presented his employee booklets to support his claim, that he was entitled on the basis of time served to 3.9 months of separation pay. He was only given 75% of three months, however, and all usual deductions therefrom were doubled. On complaint, he was told to consult with the federal government for a refund, and to contact MCC in the future only through his attorney. That action, in itself, clarifies the connection between plaintiff's discharge and his having filed a civil rights lawsuit the previous month. Although, by August of 1977, plaintiff was disabled by the deficit caused by his stroke and subsequent injuries; and although plaintiff had been given an employee booklet stating his entitlement to disability pay at 65% of his monthly base to the age of 65, he was given only two months of disability pay, from which the amount of his social security benefits were deducted. The court notes for this record at this time that plaintiff's impairments include a speech defect, and substantial loss of use of one side of his body, requiring him to walk with a cane. Prior to the stroke which he suffered en route home from work in 1976 he was in normal good health and a tournament tennis player.

This court concludes, on the basis of the facts found and the law outlined above, that defendant, through its agents, unlawfully discriminated against plaintiff because of his race in the terms and conditions of his employment, and for plaintiff's opposition to defendant's practices which constituted unlawful employment practices under Title VII of the Civil Rights Act of 1964, and 42 U.S.C. § 1981. One of the few credible statements made during defendant's case was the testimony of personnel officer Burke that he hired plaintiff to improve the Casting Center's EEO report (as well as for the reason that plaintiff would "relate" well to the many black hourly workers in the plant). From the date of his hire to the date of his termination, plaintiff's black race obviously remained the paramount consideration in all actions taken concerning him by defendant's agents. He was programmed for failure at the Casting Center, *ab initio*, by their racial animus. Dr. Kenneth Clark wrote, in "The Role of Race," *The New York Times Magazine*, October 5, 1980, as follows:

"White backlash", however is not new. It is traditional American racism in a more sophisticated, Northern urban guise. Racism, old and new, is based on the assumption that there are limits on the opportunities and benefits of American

democracy that blacks are permitted to share.

Plaintiff was acceptable at the center only as a faceless statistic for the EEO report. As a human being, his presence, because of his race, was barely tolerated by his supervision: and his aspirations for recognition as the competent engineer that he was, were not tolerated at all. Dr. Clark wrote, also, of the role which is frequently played by a black man in the position of Tillman Dozier, defendant's minority employment manager:

Many of these new black managers and executives are assigned to such race-related "created" areas as "community affairs" and "special markets." They are rarely found in line positions concerned with developing or controlling production, supervising the work of large numbers of whites or competing with their white "peers" for significant promotions. In these created jobs, blacks lack the kind of security that goes with line positions; they are kept on by the sufferance of white governmental and corporate decisionmakers.

These black employees jeopardize what little power they have if they seek to exercise it too aggressively on behalf of other blacks. It is generally understood by blacks in these positions, and by their white "benefactors," that the cause of personal racial justice can best be served if blacks demonstrate that they are "objective", "balanced", "moderate," and not too pushy on racial issues. As a consultant to private corporations on affirmative action, I have often observed that, with some noticeable exceptions, black affirmative-action offices of corporate and educational institutions are more likely to be cautious in the performance of their roles than many whites in similar positions.

■ This court has found that the defendant has engaged in racially disparate and discriminatory treatment of the plaintiff; and disparate treatment is, by definition, intentional. Title VII, at 42 U.S.C. § 2000e–5(g) provides, in pertinent part, as follows:

If the court finds that the respondent has intentionally engaged in ... an unlawful employment practice charged in the complaint, the court may ... order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement ... with or without backpay ... or any other equitable relief as the court deems appropriate. Backpay liability shall not accrue from a date more than two years prior to the filing of a charge with the commission.

In this case, the fashioning of an appropriate remedy is problematic, because the plaintiff was undisputedly adjudicated to have become totally disabled, within the meaning of the social security laws, at a date unknown to this record but in August, 1977, shortly after his discharge by defendant. The statutory limitation of defendant's backpay liability is October 28, 1974; two years prior to plaintiff's filing of an EEOC complaint. Plaintiff had requested a merit increase and/or promotion of Cleaver, Justusson, and Burke, before his first Performance Review of May 5, 1975, according to all of their testimony and his; but the record offers no precision as to what the requested increases or promotions would have been, or the dates to which they would relate-back; if plaintiff had been rated as were his fellow engineers among the initial Cleaver group whose names appear on the "Raises and Promotions" lists which are in evidence.

■ Plaintiff is entitled to recover his attorneys' fees and costs, and it is so ordered. The law is also settled that:

Exactitude in computing backpay is not required and uncertainty in determining what the claimant would have earned but for the unlawful employment practice should be resolved against the discriminating employer. *Pettway v. American Cast Iron Pipe Co.*, 494 F.2d 211 at 260–261; *Johnson v. Goodyear Tire and Rubber Co.*, 491 F.2d 1364, 1380, n. 53 (5th Cir. 1974). *Brown v. Rollins, Inc.*, 397 F.Supp. 571 (1974).

In *Johnson v. Goodyear, supra*, the court wrote that "... To implement the pur-

poses behind Title VII, a court should give 'a wide scope to the act in order to remedy, as much as possible, the plight of persons who have suffered from discrimination in employment opportunities.' *Rowe v. General Motors Corp.*, 457 F.2d 348, 354 (5th Cir. 1972). In *Pettway v. American Cast Iron Pipe, supra*, the court wrote:

> ... in computing a back pay award two principles are lucid: (1) unrealistic exactitude is not required, (2) uncertainties in determining what an employee would have earned but for the discrimination should be resolved against the discriminating employer."

In *Pettway*, the court approved back pay awards of the maximum rate which a plaintiff could have earned. It also wrote, at 494 F.2d 261:

> However, when the class size or the ambiguity of promotion or hiring practices or the multiple effects of discriminatory practices or the illegal practices continued over an extended period of time call forth the guagmire of hypothetical judgment discussed earlier, a class-wide approach to the measure of back pay is necessitated .... Any method is simply a process of conjectures.

The Order of this court is, therefore, as follows:

1. That plaintiff be and is hereby awarded his costs in this action including reasonable attorneys' fees and expenses.

2. That plaintiff be and is hereby awarded back pay for defendant's failure to promote him at the date of his first improper, untimely, and unlawful performance review on May 5, 1975, and thereafter to the same extent that merit increases, general increases, and/or promotions were accorded to his coworkers Thomas Bartos and James Lee, whichever were greater, as mentioned in plaintiff's exhibits 77, 78 and 79.

3. That plaintiff be and hereby is awarded back pay, as computed above, from the date of his termination by defendant to the date of his adjudicated total and permanent disability.

4. That plaintiff be and hereby is awarded disability benefits from the date of defendant's discontinuance of those benefits, at the rate of 65% of plaintiff's monthly base pay until he shall reach the age of 65, or as the appropriate and applicable disability benefit plan of defendant shall provide.

5. Counsel for the parties are directed to meet and confer within fifteen (15) days of entry of this order for the purpose of fixing or agreeing upon the amount to be awarded as back pay and benefits pursuant to the formula set out herein. Absent an agreement by the parties, the plaintiff will notify the court within twenty (20) days of entry of this judgment and the court will thereafter enter an order fixing the dollar amount of the back pay and benefits award.

6. Counsel for the parties are also directed to meet and confer within fifteen (15) days of the entry of this Order and Judgment for the purpose of agreeing upon costs, attorneys' fees and expenses. Absent such an agreement (1) counsel for the plaintiff is directed to file with the court a statement of time for which attorneys' fees are claimed and an itemization of expenses; and (2) the defendant is directed to file a statement with the court setting forth the bases on which they have compensated their counsel. The respective statements required herein shall be filed within twenty (20) days of the entry of this Judgment.

IT IS SO ORDERED.